THOMAS S., Joyce M. Brooks, appt'd guardian ad litem, Appellee,

v.

Sarah T. MORROW, Secretary of N.C. Dept. of Human Resources, Appellant,

and

Allen Childress, guardian for pltf.; Benjamin Carpenter, Director of the County Dept. of Social Services; James Melton, Director of Gaston-Lincoln Area Mental Health Program; Harley B. Gaston, Jr., David Beam, David Hollifield, James Forrester, Dean Carpenter, Robert Heavner, Porter McAteet, Gaston County Commissioners, Defendants.

THOMAS S., Joyce M. Brooks, appt'd guardian ad litem, Appellee,

v.

Allen CHILDRESS, guardian for pltf., Appellant,

and

Sarah T. Morrow, Secretary of N.C. Dept. of Human Resources; Benjamin Carpenter, Director of the County Dept. of Social Services; James Melton, Director of Gaston-Lincoln Area Mental Health Program; Harley B. Gaston, Jr., David Beam, David Hollifield, James Forrester, Dean Carpenter, Robert Heavner, Porter McAteet, Gaston County Commissioners, Defendants.

Nos. 84–2254, 84–2255.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1985.

Decided Jan. 9, 1986.

Rehearing and Rehearing En Banc Denied Feb. 19, 1986.

Cathy J. Rosenthal, Associate Atty. Gen., Raleigh, N.C., Robert Gage, Morganton, N.C., Wilson Hayman, Asst. Atty. Gen., Raleigh, N.C. (Cox & Gage, Morganton, N.C., Lacy H. Thornburg, Atty. Gen., William F. O'Connell, Sp. Deputy Atty. Gen., Raleigh, N.C., on brief), for appellants.

Edward G. Connette, Charlotte, N.C., Roger Manus, Raleigh, N.C. (Harper, Connette & Stovall, Carolina Legal Assistance, Theodore O. Fillette, III, Legal Services of Southern Piedmont, Inc., Charlotte, N.C., on brief), for appellee.

Before WINTER, Chief Judge, HALL, Circuit Judge and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

The primary issue in this appeal is whether the district court properly applied the principles explained in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Youngberg* the Court recognized that a patient in a state mental institution has a right to "adequate food, shelter, clothing, and medical care."

457 U.S. at 315, 102 S.Ct. at 315. *Youngberg* also established that a mentally retarded person involuntarily committed to a state institution retains liberty interests secured by the due process clause of the fourteenth amendment in "safety and freedom from bodily restraint." 457 U.S. at 319, 102 S.Ct. at 2459. These liberty interests "require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." 457 U.S. at 319, 102 S.Ct. at 2459. The Court explained that to determine what training "is 'reasonable'—in this and in any case presenting a claim for training by a State—we emphasize that courts must show deference to the judgment exercised by a qualified professional." 457 U.S. at 322, 102 S.Ct. at 2461.

Although the facts of this case differ from those in *Youngberg*, we conclude that the district court did not err by turning to *Youngberg* for guidance. The district court held that the state should implement a training or treatment plan prescribed by its own professionals for a young incompetent adult who, from birth, has been a ward of the state or of a guardian appointed by the state. Finding no cause for reversal in the assignments of error, we affirm the order of the district court with but slight modification.[1]

## I

Thomas S. was placed for adoption by his mother at his birth in 1963. The Gaston County, North Carolina, department of social services took custody of him until his eighteenth birthday, when he was adjudged incompetent and a guardian was appointed for him. All told, he has lived in more than 40 foster homes and institutions.

Soon after Thomas was born, hospital personnel told the county social worker responsible for Thomas's placement that he was hyperactive and required a "special home to meet [his] needs." Thomas was placed with a licensed foster mother when he was six days old. He lived with her for about five and a half years, until his foster mother "could no longer handle Tom's problems." He then lived in a second foster home for five months. The foster parents asked that he be removed because he bit and clawed the other children and was unable to share, demanding full attention from the foster parents. Thomas was then placed in a group home for disturbed children. He was removed five months later, according to the department of social services, because the group home "could not meet Tom's needs. There was no treatment for him...." In September 1969 Thomas was moved to an institution for emotionally disturbed children, where he remained for one year. There he received therapy and learned to control his inappropriate behavior so he could reside in a less restrictive environment. In September 1970 he was placed in Children's Home of Winston-Salem, where he remained until 1978. During this time, at least four different sets of foster parents gave him occasional respite care.

In February 1977, when Thomas was 13, the social services department decided to reunite him with his mother. Although his mother initially wanted Thomas to live with her, during his visit she decided that she could not cope with him because he was jealous of her other children and physically abused them. He also had tantrums in which he screamed obscenities. Thomas went back to Children's Home and did not see his mother again.

It then became more difficult to cope with Thomas's behavior. He retreated into his own world of model cars, and he attempted suicide several times. In September 1978 he was placed in a receiving home in Gaston County and at the end of that month was placed in Broughton Hospital, one of North Carolina's state mental institutions. He remained there for over a year. At his discharge from Broughton Hospital in February of 1980, Thomas's

---

**1.** *Thomas S. v. Morrow*, 601 F.Supp. 1055 (W.D. N.C.1984). The district court entered a judgment based on the published order and certified it pursuant to Federal Rule of Civil Procedure 54(b).

psychiatrist recommended that he be placed in "a less restrictive setting in the community," preferably "a group home and perhaps later, a halfway house." From February until April 1980, Thomas lived in a group home for emotionally disturbed children. The home requested that he be removed because he frequently ran away and he upset the other children. For the next four weeks, Thomas was housed "in a piece-meal fashion here and there," according to the county department of social services. By May 12, "we had no other place to turn and we brought him to Broughton." At his discharge from Broughton in June 1980, the psychiatrist directing the unit that had cared for him reported that the "[s]taff in all areas affirmed need for Tom to be in less restrictive and less dependent place.... [I]t was felt community placement and outpatient mental health support were appropriate to meet his needs." At Thomas's discharge, he was placed in an emergency shelter in Iredell County and eventually with another foster family.

In June 1981 he was returned to Broughton Hospital, but he was discharged in about a week at his own request and against medical advice. Thomas was then placed at Gerald's Lazy Acres Rest Home for the elderly, where he lived from June 1981 through March 1982.

Thomas reached 18 while living at Lazy Acres, and Gaston County began proceedings to have him declared incompetent. His guardian ad litem sought a psychological and social evaluation of Thomas at the division for disorders of development and learning at North Carolina Memorial Hospital. Psychologists evaluated Thomas's mental functioning as being on the borderline between average intelligence and mild mental retardation. His social functioning was evaluated as being at "a much lower level," in the moderately mentally retarded range. The social worker on the evaluation team noted that Thomas had "experienced multiple changes in his social environment" in the past ten years. "While a variety of services have been provided him, coordinated planning of services has been difficult

and there has been no therapeutic situation available for any length of time since his early adolescence." Consequently, "Tom has lacked for consistent significant persons in his life." The evaluation team concluded that Thomas "needs a stable, very structured environment for three to six years" that would give him "consistency in his social contacts" so that he could "develop trust in interpersonal relationships." Specifically, he needed vocational training, training in social skills, "opportunities for social interaction with peers," and "opportunities to practice in the community the skills he already has and those he will be acquiring before he is discharged from this supervised environment." He "might join a club, participate in structured physical education activities, attend dances or social events." The team summarized: "In planning for Tom, his psychosocial maladjustment is the critical issue that must be addressed."

Thomas was adjudged incompetent. In February 1982 Allen Childress, regional adult mental health specialist with the North Carolina department of human resources, was appointed Thomas's guardian. The guardian visited Thomas at Lazy Acres and decided that the rest home was an inappropriate placement. The guardian later commented on Thomas's condition at the time: "He weighed 197 pounds and was taking five separate medications, which effectively subdued his personality. He was the only person of his age in that rest home. He had no peers in the rest home. He had no social or recreational or educational or vocational opportunities, and no access to therapeutic counselling." Sleeping, eating, and listening to the radio were Thomas's main activities at Lazy Acres. He gained at least 25 pounds and became emotionally unstable and hallucinatory. He withdrew again into his world of model cars.

The guardian transferred him to the mental retardation unit at Broughton Hospital, in part to enable the guardian to assess Thomas's needs and to enable Gaston County to identify resources to meet

those needs. A few weeks after Thomas's admission to Broughton Hospital, a team of social workers, occupational therapists, and psychologists devised his treatment plan.

The team feels Tom should be ready for community placement in Gaston County in three to six months. He would be able to live successfully in a co-ed group home for adults (ages 13 to 35) with a Vocational Rehabilitation Sheltered Workshop ... or in a CETA on-the-job training program ... during the day.... Counseling through the Department of Social Services and mental health to address medication needs, behavior problems, if they arise, and emotional needs would be required periodically. The home environment would need to be somewhat structured during non-work hours to provide activities therapeutic to Tom's needs and related to his interests (cars, trucks, fishing, bike riding, outdoors activities).

\* \* \* \* \* \*

Tom basically needs to be a part of a home where he can establish family ties in order to mature and develop through the natural progression of growing up to adulthood. He was hardly ever in any one place long enough to put down any roots.

On June 2, 1982, six weeks after Thomas's admission to Broughton, the Broughton social worker on Thomas's treatment team wrote to the Gaston-Lincoln mental health agency to advise it of Thomas's needs upon his anticipated discharge on June 17:

We have identified the following needs as priority:

1. Community-based living either in a group home or adult foster care home
2. Sheltered Workshop activities or some type of daily vocational training activity
3. Involvement with the local mental health center for medication review and counseling to improve his self-concept/self-esteem

The team feels that Tom basically needs to be a part of a home where he can establish meaningful relationships and that will provide sufficient structure to allow him to mature and develop through a natural progression to adulthood. The team feels that in two to five years, Tom should be able to live in a semi-independent or independent living situation in the community after this maturation process has been completed. The home environment should be structured during non-work hours to provide activities responsive to Tom's needs and related to his interests (cars, trucks, fishing, bicycle riding, and outdoor activities).

Thomas was not released on June 17 as planned. In fact, he was not released until March of the following year. Upon receiving the Broughton social worker's recommendation, the director of the Gaston-Lincoln agency advised the social worker and Thomas's guardian that the mental health agency could offer only outpatient counseling, not residential services. The guardian responded that because of "the obvious inability of the community to care for Tom at this time, I agreed to recommend the continuation of the commitment to give Gaston County extended time to identify resources appropriate to Tom's need."

In October 1982 the hospital social worker contacted the Gaston County department of social services with a recommendation similar to that previously sent to the mental health agency:

We recommend that Tom be placed in an MR [mental retardation] group home or other highly structured environment for an extended period of time in order to gain the ability to live independently in the community. Placement of choice is a mental retardation group home for high-functioning males which has an Adult Day Activities Program/Workshop capability. This home should be located in an area which is both willing and able to provide counseling services and medication review for Tom.

In November 1982 a two-day psychological evaluation was made by the North Carolina division of mental health and mental

services at Broughton Hospital for the purpose of "determining Tom's needs for community placement." The team of psychologists, social workers, and psychiatrists assessed Thomas's weaknesses as his lack of self-direction and his lack of socialization skills. The reporting psychologist explained that "the reason for these deficits is lack of motivation, lack of freedom with appropriate supervision, and the numerous placements which have resulted in a lack of continuity in training." Thomas's score on intelligence tests had improved to the "dull normal" level of intelligence, and the team concluded that Thomas should no longer be diagnosed as mentally retarded. The psychologist also noted that his social maturity score had improved since the evaluation made one year previously at North Carolina Memorial Hospital. The psychologist attributed this improvement to "the fact that he has been in a stable environment" for the past eight months.

The nine-page evaluation concluded with seven specific recommendations.

1. Placement in a group home with adults of average intelligence without severe emotional difficulties (stable environment with structure)
2. Counseling by both male and female therapists regarding conflicts in establishing relationships with both men and women
3. Needs exposure to many social situations outside of the institutional environment (e.g. shopping, dining out, short trips, etc.)
4. Attend an Outward Bound Course (21-day course) to help develop his ego, strength, and self-concept.
5. Placement in an environment that will allow the perfect balance between supervision and freedom so that Tom will not feel rejected
6. Training in mathematics and money management
7. Training in a specific trade like auto mechanics so that Tom will more likely be able to support himself in the future[.]

On November 24, 1982, the Broughton staff devised a discharge plan for Thomas, prefacing it with the evaluation that "he has reached his maximum functioning level within Unit R [the mental retardation unit] and now needs further services in a more normal setting to develop his capabilities." The staff changed Thomas's diagnosis from mild retardation to "adjustment Disorder with Mixed Emotional Features" and noted that "Tom is extremely aware that he is living with mentally retarded individuals and often voices his thoughts of not wanting to be around 'those retarded people.' We feel this is a normal and healthy reaction to being housed in this situation." The staff reiterated its view that institutional placement was not right for him. "The team feels Tom has received maximum benefit from training and counseling in the institutional setting and is now ready for community placement. Tom no longer requires custodial care in an institutional level, and continued provision of this would be inappropriate." The staff made three recommendations for Tom's residential placement:

The desired placement for him would seem to be an adult foster care situation in which he would live in a family home with parents who could provide the love and caring and structure that Tom needs to complete the maturation process toward adulthood. He will need Adult Basic Education classes several hours a day and vocational training classes to prepare him for competitive employment. Tom needs assertiveness training to improve his self-concept. This could be possibly accomplished through a three-week course at the Outward Bound School. A second choice of the team for placement would be a group home for normal adults with a structured environment consisting of the education classes, work skills training, and somewhat structured leisure time. A third choice of placement would be a family care home providing similar services.

Thomas was released from Broughton on March 3, 1983.[2] For the next nine months he lived with a foster family in Cleveland County. According to his guardian,

> [Thomas] functioned as a family member, performing household chores, shopping, and personal care tasks. He completed an internship in training as a nursing home attendant. He participated in karate classes, the Boys Club, and other community activities. He developed friends in the community outside of his foster home.
>
> Tom maintained himself in good physical condition, improved his general appearance through increased grooming and improved clothing, and maintained his weight loss.

Thomas became upset, however, upon being required to have a roommate and upon meeting members of his biological family. Thomas announced his decision to live with his sister, who did not agree to the plan. Thomas then decided to leave the foster home, and a magistrate committed him to Broughton Hospital.

After two weeks at Broughton, he was placed in the McCay group home for developmentally disabled adults in Morganton, where he remained for about five months. He became upset with his roommate and moved out to the home's two-car garage. He also ran away several times and requested the Burke County department of social services to investigate his living situation.

On May 19, 1984, Thomas was placed at a rest home in Wilkes County that housed elderly and emotionally ill adults. Day treatment was available to him at a center several miles from the rest home. Thomas remained at the rest home for three months. In August 1984 he was moved to the Gaston County detoxification and night care facility, where he was living at the time of the district court's entry of final judgment on December 7, 1984.

## II

On July 7, 1982, four months after Thomas's second commitment to Broughton Hospital, Thomas S. by his next friend brought this suit against Sarah Morrow, Secretary of the North Carolina department of human resources; Allen Childress, in his official capacity as Thomas's guardian; and the directors of two local agencies, the Gaston County department of social services and the Gaston-Lincoln area mental health program. An amended complaint joined as additional defendants the Gaston County commissioners.

The complaint alleged that the defendants had denied Thomas substantive due process accorded by the fourteenth amendment. It protested the defendants' failure to provide minimally adequate treatment, alleging that Thomas's hospitalization imposed a degree of restraint on his liberty inconsistent with professional judgment concerning his appropriate treatment. It also charged that the defendants had deprived him of liberty interests created by state law. Thomas requested an injunction ordering the defendants to place him in an appropriate group home and to provide other treatment recommended by the professionals who had examined and worked with him.

On May 26, 1983, the court entered a consent order permitting the two local agencies named as defendants to contract with an independent nonprofit organization for foster care and treatment from the date of Thomas's discharge from Broughton until March 1, 1984. Because of the consent order, the court deferred all parties' motions for summary judgment and declared the case inactive until February 1, 1984.

Upon reactivating the case and considering further motions, the district court on September 18, 1984, ruled on cross motions for summary judgment. The court dismissed all pendent state law claims against state officials, in accordance with *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The court also dismissed without prejudice the claims against the local officials. It granted summary

2. This release was pursuant to the consent decree mentioned in Part II, *infra*.

judgment against the Secretary of the department of human resources and Thomas's guardian.

On December 7, 1984, the court entered a judgment requiring the Secretary and the guardian to develop a treatment plan and appoint a case manager for Thomas. It directed them to furnish Thomas the treatment recommended by the qualified professionals who had evaluated his needs. In accordance with the recommendations, the order specified that Thomas should be placed in a "stable suitable supervised community residential placement such as: (1) a non-institutional specialized adult foster care situation ... or (2) a group home with adults of average intelligence." Adhering to the recommendations, the court also directed that Thomas should be provided non-residential services such as mental health counseling, adult basic education and vocational training, and "opportunities for community interaction." The Secretary and the guardian appealed.

### III

The Secretary contends that she has not violated Thomas's "fourteenth amendment right to liberty of movement and freedom from restraint." She advances several reasons for reversing the district court's order. She asserts that *Youngberg* is inapplicable because Thomas, in her words, "lives in the community and is not subject to the control of the state," and because in any event he has received minimally adequate treatment consistent with professional judgment. She also contends that, because Thomas is not in a state institution, North Carolina law places responsibility for him on local authorities and not on her department. Finally, she says that the district court erred in granting summary judgment because the record disclosed genuine issues of material fact.

There are, of course, differences between *Youngberg* and Thomas's case. In *Youngberg* the court dealt with a claim for damages against state officials for breach of constitutional rights. 457 U.S. at 311, 102 S.Ct. at 2455. Thomas does not sue for money; he seeks only the treatment that professionals at a state hospital have prescribed. But this distinction between the cases does not militate against Thomas. The principles undergirding the Court's decision in the action for damages afford a sound foundation for the exercise of equitable powers to fashion remedial, prospective relief. *See Scott v. Plante*, 691 F.2d 634, 637 (3d Cir.1982). Much of *Youngberg* necessarily addresses the situation of a single patient confined to an institution, but the Court did not intend the liberty interests it identified to be limited to these circumstances. The liberty interests protected in *Youngberg* did not arise because of the institutional confinement. Rather, the Court's premise was that involuntary commitment and other lawful confinement "do not extinguish" pre-existing liberty interests in safety and freedom from bodily restraint. 457 U.S. at 315, 102 S.Ct. at 2457.

Although during the course of this litigation Thomas's lodging has changed from a state hospital to a night care unit at a detoxification center, his status has not changed. He remains a legally incompetent adult who is a ward of a guardian appointed by the state. He did not choose to live at the detoxification center, and he is neither an alcoholic nor a drug addict. *Youngberg* does not suggest that an incompetent person sheds the basic liberty interests that the Court identified when state officials and his guardian move him from one facility to another.

In *Youngberg*, the Court recognized that it is not feasible to specify the type of training for every case. Nevertheless, it explained principles that are broad enough to govern diverse factual situations. With respect to a state's duty to provide training, the Court said: "The basic requirement of adequacy ... may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case." The Court coupled this definition with the admonition to "identify a constitutional predicate for the imposition of any affirmative duty on a

State." 457 U.S. at 319 n. 25, 102 S.Ct. at 2460 n. 25. Moreover, the Court emphasized that in determining what is reasonable "in any case presenting a claim for training by a State ... courts must show deference to the judgment exercised by a qualified professional." 457 U.S. at 322, 102 S.Ct. at 2461.

■ The district court followed *Youngberg*'s precepts. It identified as a constitutional predicate to its decree Thomas's liberty interests in safety and freedom from undue restraint. In fashioning a remedy, it relied on the recommendations of the state's professionals at Broughton Hospital. The district court did not err in finding that treatment and training based on the recommendations were reasonable in light of Thomas's liberty interests and the circumstances of the case. Tom's safety was threatened by his aggressiveness and his attempted suicide. These problems were fully documented and well known to the team of professionals who evaluated him and prescribed corrective treatment. With respect to Thomas's interest in freedom from undue restraint, the professionals at Broughton noted: "Maximum of invivo [sic] exposure to the community is essential (night hospitalization and full time day involvement in the local community could be considered as one possibility to start with)." Their recommended treatment included transfer from the hospital to a group home in the community.

■ The Secretary's assertion that Thomas has received minimally adequate treatment consistent with professional judgment is not supported by the record. Although the professional team at Broughton suggested that night hospitalization could be considered a possibility to start Thomas's treatment, the night care unit at the detoxification center is designed for persons "able to respond to short term night care for 7–14 days." Thomas was lodged there for months. No professional has taken the position that lodging him in a night care unit operated in conjunction with a detoxification center is compatible with the treatment prescribed for him. Assignment to this lodging appears to have been based on expediency and a decision to save money.

*Youngberg* points out that lack of funds is an absolute defense to an action for damages brought against a professional in his individual capacity. 457 U.S. at 323, 102 S.Ct. at 2462. But the Court did not apply this precept to prospective injunctive relief. Instead, the Court explained that qualified professionals, to whom the courts owe deference, may consider the burden on the state when they prescribe treatment. 457 U.S. at 322 and n. 29, 102 S.Ct. at 2461 and n. 29. The Court did not allow the professionals free rein, however. A decision about treatment made by a professional is presumed valid, but a court may reject it when it "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. at 2462.

■ There is no evidence that the evaluation team at Broughton who prescribed Thomas's treatment did not take costs into consideration. One cannot assume that the qualified professionals drafted prohibitively expensive recommendations. The presumption of validity accorded the professionals' decision about appropriate treatment has not been rebutted. Consequently, in the absence of evidence that the decision is a "substantial departure from accepted professional judgment, practice, or standards," the district court was required to accept the recommendations of the qualified professionals at Broughton. *See* 457 U.S. at 323, 102 S.Ct. at 2462.

*Society for Goodwill to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir.1984), and *Phillips v. Thompson*, 715 F.2d 365 (7th Cir.1983), on which the Secretary relies, do not counsel that Thomas be denied relief. As the Secretary emphasizes, these cases stand for the proposition that there is no right to placement in the community. But neither of these cases involved a professional's judgment concerning the appropriate treatment for a specific

individual. In *Society for Goodwill* the district court's order that 400 mentally retarded patients be placed in the community by 1987 was reversed. In *Phillips* the district court's refusal to place a class of several hundred mentally retarded adults in the community was affirmed. Thus, these decisions do not apply to the facts in Thomas's case, in which a discrete recommendation for treatment was made by qualified professionals to meet the needs of an individual, as contemplated by *Youngberg*, 457 U.S. at 319 n. 25, 102 S.Ct. at 2460 n. 25.

The Secretary argues that North Carolina law makes local mental health authorities responsible for Thomas's treatment in the community. The local authorities asserted that the state, acting through the department of human resources, is responsible.

■ By statutory definition, the Secretary's department is "[t]he unit of State government authorized to implement, administer, and monitor community-based programs in cooperation with local governmental authorities...." N.C.Gen.Stat. § 122–35.36(6). This and related statutes justify the district court's ruling that the state, acting through the Secretary, was responsible and that the Secretary at her election could provide the required treatment through local authorities. The district court's understanding of the relationship between the Secretary and local authorities is supported by *Vaughn v. North Carolina Department of Human Resources*, 296 N.C. 683, 252 S.E.2d 792 (1979). *Vaughn* holds that within the meaning of the Tort Claims Act a county director of social services and his staff act as agents of the state department of human resources with respect to the placement of children in foster homes. *Accord Milner v. Trend Community Mental Health Services*, Docket TA 7353 (N.C.Indus.Comm'n Nov. 10, 1981), *aff'd* (N.C.Indus.Comm'n July 28, 1982) (for purposes of Tort Claims Act, doctors employed by local mental health authority are agents of department of human resources).

Finally, we reject the Secretary's claim that genuine issues of material fact preclude summary judgment. Although the evidence presented in Thomas's behalf is voluminous, the district court did not rest on it. Instead, the court based summary judgment on the report and recommendation of the Secretary's professionals at Broughton Hospital, which were introduced into evidence by the Secretary. The guardian, through his counsel, also acknowledged:

What Tom needs is as follows:

a. A room to stay in, to meet his needs for privacy, within a supervised home with resident managers;

b. Provision of meals at scheduled times;

c. Developmental skills training, in self care and housekeeping as needed;

d. Outside program resources, as needed:
   i. Vocational training
   ii. Psychosocial rehabilitation
   iii. Adult basic education
   iv. Individual therapeutic counseling
   v. Supportive/behavioral counselling and
   vi. Case management.

This represents a consensus of those involved in Tom's treatment for the past 1½ years. If his needs are many, we point out that substituting for twenty years of no family and little or no treatment is not an easy thing.

The remedy ordered by the court responds to these needs. There is no genuine issue of material fact about them or about the recommendations on which the order is based.

In sum, we find in the record no warrant for reversing the district court's order granting summary judgment and requiring implementation of the treatment and training prescribed by qualified professionals at Broughton Hospital.

## IV

The district court directed both the guardian and the Secretary to furnish Thomas specific treatment based on the recommendation of qualified professionals. The court also directed the guardian to "exercise his duties and responsibilities to the full extent required· by N.C.Gen.Stat. § 35–1.34 and in a manner not inconsistent with the judgment." It absolved the guardian from personal responsibility for providing funds or resources for the treatment that it ordered.

The guardian assigns error to the district court's order on three grounds. He contends that the court lacks jurisdiction over him on the basis of 42 U.S.C. § 1983, because he has not acted under color of state law and because his actions cannot be attributed to the state. He argues that because he is a fiduciary, not a care giver, he is not subject to the requirements of *Youngberg.* Finally, he asserts that the eleventh amendment deprives the court of jurisdiction to instruct the guardian on the performance of his duties prescribed by state law. The guardian does not assign error to any of the specific provisions pertaining to the treatment ordered by the court. Indeed, throughout this litigation the guardian has tried to secure for Thomas the treatment recommended by the professionals.

■ We find that jurisdiction over the guardian is proper under 42 U.S.C. § 1983. In *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982), the Court explained that "conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." The Court then outlined a two-part test for determining whether a defendant's acts may be attributed to the state. The first component of the test, the "under color of state law" requirement of § 1983, is satisfied if the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." 457 U.S. at 937, 102 S.Ct. at 2753.

In this case the guardian's authority over Thomas is a "right or privilege created by the State." By statute, "[t]he essential purpose of guardianship is to replace an individual's authority to make decisions with the authority of a guardian when the individual does not have adequate capacity to make such decisions." N.C.Gen.Stat. § 35–1.6(3). A panoply of provisions empowers the guardian to implement this broad legislative purpose. Among the guardian's powers are the authority to establish his ward's domicile and to provide for his training and treatment. N.C.Gen. Stat. § 35–1.34(a)(1) and (a)(2). North Carolina law also authorizes the guardian to "give any consent or approval that may be necessary to enable the ward to receive medical, legal, psychological, or other professional care, counsel, treatment, or service." N.C.Gen.Stat. § 35–1.34(a)(4). Exercising his authority to make decisions for Thomas, the guardian arranged that Thomas be placed at Broughton Hospital and agreed to the temporary continuation of the commitment.

The guardian's reliance on *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), is misplaced. In *Polk County* the Court held that a public defender does not act under color of state law within the meaning of § 1983. Nevertheless, as the Court in *Polk County* pointed out, one who performs a custodial function pursuant to state law falls within the scope of § 1983. *See* 454 U.S. at 320, 102 S.Ct. at 450. There can be no doubt that the guardian has custody of his ward, Thomas. N.C. Gen.Stat. § 35–1.34(a)(1).

The second component of the *Lugar* test of a cause of action under § 1983 inquires whether the defendant "may fairly be said to be a state actor." 457 U.S. at 937, 102 S.Ct. at 2753. In this case the guardian is properly characterized as a state actor because "he has acted together with or has obtained significant aid from state officials...." 457 U.S. at 937, 102 S.Ct. at 2753. Working with the state hospital and with officials from local agencies, the guardian had Thomas admitted to Brough-

ton Hospital and to succeeding placements. In *Lugar* the Court recognized that "a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." 457 U.S. at 941, 102 S.Ct. at 2755, *citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). The actions of the guardian in joining with state officials to have Thomas moved from place to place irrespective of Thomas's will are legally indistinguishable from the seizure challenged in *Lugar.*

The guardian relies in part on *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), as authority for the proposition that a guardian appointed by the state is not a state actor for purposes of 42 U.S.C. § 1983. In *Parham* the Court ruled that the procedural due process required by the fourteenth amendment was the same when either a parent or a guardian sought to admit a child to a state mental hospital. The guardian contends that this ruling and the reasoning underlying it establish that the guardianship is associated with the interests of the ward and is identified with parental rather than state control.

We cannot accept the argument that *Parham* requires dismissal of the guardian. In the first place, the question of the guardian's status as a state actor for the purpose of § 1983 was not before the Court in *Parham.* In the second place, the Court observed that there may be a difference in procedures required for reviewing a ward's need for continuing care as compared with the procedures required to review a similar need of a child with natural parents. The Court acknowledged the risk that a child without natural parents may be "lost in the shuffle." 442 U.S. at 619, 99 S.Ct. at 2512. It noted that the ward's commitment to the institution may have been prolonged because his guardian had difficulty finding a foster home. This situation is quite similar to the one that confronts Thomas. Rather than dismissing the guardian, as Thomas's guardian asks us to do, the *Parham* Court remanded the case for consideration of the issue of whether wards of the state should be treated differently from children with natural parents with respect to their long-term placement.

■ We conclude that the guardian acted under color of state law and that he is a state actor for purposes of jurisdiction under § 1983. Moreover, the guardian was properly joined under Rule of Civil Procedure 19. The powers of the guardian are so pervasive that in his absence complete relief cannot be afforded Thomas. The guardian is subject to service of process and his joinder will not deprive the court of jurisdiction over the subject matter of the action.

■ The guardian argues further that "a defendant whose responsibility to plaintiff does not derive from direct provision of care cannot be brought to task under *Youngberg.*" The guardian points out that he was appointed under a state law requiring that a "disinterested public agent" serve as guardian of an incompetent when no private individual or corporation can be found who is willing to serve. N.C.Gen. Stat. § 35-1.29. By law, the "disinterested public agent" must be "an adult officer, agent, or employee of a State human resources agency who has no immediate responsibilities for providing services to a ward...." N.C.Gen.Stat. § 35-1.7(4).

■ Nevertheless, the guardian's responsibilities cannot be distinguished from those of the defendants in *Youngberg* on the ground that the guardian has no immediate responsibility for providing services to his ward. The defendants in *Youngberg* were the administrators of the state hospital to which the respondent had been committed. 457 U.S. at 310 n. 3, 102 S.Ct. at 2455 n. 3. They had custody of the patient and were responsible for making decisions concerning his treatment and training. Similarly, the guardian has legal custody of Thomas and is responsible for making decisions concerning his treatment. We agree with the guardian, however, that *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79

L.Ed.2d 67 (1984), precludes a federal court from directing a state official to perform the duties imposed on him by state law. Consequently, on remand the district court should delete from its order the direction to the guardian pertaining to the exercise of his duties under state law. This modification of the decree does not relieve the guardian from all responsibility with respect to the relief the district court ordered. He must, as the district court required, exercise his authority over Thomas in a manner not inconsistent with the court's judgment. This obligation remains as a matter of federal law. He cannot act under color of state law to infringe the liberty interests secured by the fourteenth amendment that are the subject of this litigation.

The judgment entered against the Secretary is affirmed. The judgment entered against the guardian is affirmed, subject to modification consistent with this opinion. The case is remanded to the district court.