**THOMAS S.,** by his guardian ad litem, Joyce M. BROOKS; Jeanette H.; Todd C.; Phillip B.; Margaret R., by her guardian ad litem, Cornelius Manly, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

v.

**David T. FLAHERTY,** Secretary, North Carolina Department of Human Resources, Defendant–Appellant,

and

Allen Childress, guardian for the plaintiff; Benjamin Carpenter, Director of the County Department of Social Services; James Melton, Director of Gaston–Lincoln Area Mental Health Program; Gaston County Commissioners, to wit: Harley B. Gaston, Jr., David Beam, David Hollifield, James Forrester, Dean Carpenter, Robert Heavner, Porter McAteet, Defendants.

No. 89–1006.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1989.

Decided May 2, 1990.

As Amended May 23, 1990.

Wilson Hayman, Asst. Atty. Gen., David McLean Parker, Asst. Atty. Gen. (argued), Raleigh, N.C., for defendant-appellant.

Roger Todd Manus (argued), Raleigh, N.C., for plaintiffs-appellees.

Lacy H. Thornburg, Atty. Gen., Reginald L. Watkins, Sp. Deputy Atty. Gen., on brief, Raleigh, N.C., for defendant-appellant.

Deborah Greenblatt, Christine O. Heinberg, Carolina Legal Assistance Inc., Raleigh, N.C., Edward G. Connette, III, Gillespie, Lesesne & Connette, Theodore O. Fillette, Legal Services of Southern Piedmont, Inc., on brief, Charlotte, N.C., for plaintiffs-appellees.

Before HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.

BUTZNER, Senior Circuit Judge.

This case is the class action phase of litigation about the constitutional rights of mentally retarded patients in public psychiatric hospitals in North Carolina. In *Thomas S. v. Morrow*, 781 F.2d 367 (4th Cir.1986) (*Thomas II*), this court affirmed the district court's grant of summary judgment for the named plaintiff Thomas S. against the Secretary of the North Carolina Department of Human Resources. *Thomas S. v. Morrow*, 601 F.Supp. 1055 (W.D.N.C.1984) (*Thomas I*). In this, the second phase of the litigation, the district court certified a class of patients similarly situated to Thomas S. After a bench trial, the court issued detailed findings of fact and conclusions of law and ordered injunctive relief for the class members. *Thomas S. v. Flaherty*, 699 F.Supp. 1178 (W.D.N.C.1988) (*Thomas III*). The Secretary appeals the district court's judgment. We affirm.

The district court described the history of the proceedings and the facts in detail. *Thomas III*, 699 F.Supp. at 1181–99. It is not necessary to reiterate the court's findings and conclusions other than to say they dealt with the deficient care of mentally retarded persons in North Carolina's psy-

chiatric hospitals. We proceed to address the Secretary's arguments on appeal.

## I

The Secretary first contends that the district court did not follow the principles of *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and *Thomas II*, 781 F.2d 367. Specifically, he asserts that the court did not defer to the judgment of treating professionals.

The Supreme Court in *Youngberg* held that a mentally retarded individual in state custody "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." 457 U.S. at 324, 102 S.Ct. at 2462. To determine whether an individual's rights have been violated, courts must show deference to the decisions of professionals:

> [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

457 U.S. at 323, 102 S.Ct. at 2462 (footnote omitted).

The purpose of this standard is to prevent a judge or jury from using "unguided discretion" to balance the individual's liberty interests against the state interest in restraining liberty. 457 U.S. at 321, 102 S.Ct. at 2461. Deference to professionals ensures that federal courts do not unnecessarily interfere with the internal operations of state institutions. 457 U.S. at 322, 102 S.Ct. at 2461.

■ The decisions of the treating professionals are not conclusive, however. Although the question of admissibility of expert testimony offered by the mentally retarded plaintiff was not appealed to the Supreme Court in *Youngberg*, the Court noted that this expert testimony may have been relevant to whether the treating professionals' decisions substantially departed from accepted standards. 457 U.S. at 323 n. 31, 102 S.Ct. at 2462 n. 31.

Here, the district court avoided the danger that the *Youngberg* standard was designed to prevent. It did not weigh the decisions of the treating professionals against the testimony of the class members' professionals to decide which of several acceptable standards should apply. Rather, as *Youngberg* requires, it presumed that the decisions of the treating professionals were valid. However, it found that many of the decisions of the treating professionals had not been implemented. This was also the situation in *Thomas II*, 781 F.2d at 374–76.

■ The court also found areas in which the decisions of the treating professionals substantially departed from accepted standards. Specifically, the court found the Secretary's decisions "to confine mentally retarded persons with no diagnosis of mental illness in state psychiatric hospitals," "to place mentally retarded persons on general psychiatric wards," "to seclude and mechanically restrain the plaintiffs without employing behavioral treatment programs," "to administer antipsychotic drugs at the levels and under the conditions found to exist in the state psychiatric hospitals," and "to ignore the community placement recommendations of the state's treating professionals" substantially departed from accepted professional standards. 699 F.Supp. at 1201–02. The court identified the accepted professional standards regarding drug use, restraint, and habilitation based on the Secretary's written policies and the testimony of the plaintiffs' and defendant's experts. There is ample evidence supporting the court's finding that the Secretary substantially departed from these identified standards.

■ The Secretary contends that the district court erred in rejecting the significance of the accreditation of the four state hospitals by the Joint Committee on Accreditation of Hospitals (JCAH) and the certification of the R Unit at Broughton Hospital by the Health Care Financing Ad-

ministration as an intermediate care facility for mentally retarded patients.

■ This argument does not withstand analysis. Relevant accreditation is prima facie evidence of constitutionally adequate conditions. *See Woe v. Cuomo,* 729 F.2d 96, 106–07 (2d Cir.1984). The record, however, supports the court's conclusion that this presumption was rebutted by evidence of serious deficiencies found by the accreditation team. During a survey by JCAH personnel while this action was pending, their report disclosed the following deficiencies in Broughton Hospital, which is generally regarded to be superior to other state institutions:

(1) Minimal participation of patients and their guardians in treatment planning.

(2) Insufficient professional and support staff to supervise and implement the treatment plan or provide adult educational services.

(3) Inadequate or non-existent emotional, behavioral, activities, legal and vocational assessments.

(4) Inadequate treatment plans and inadequate documentation of their implementation.

(5) Use of special treatment procedures that are not justified in light of the harm they are known to cause.

(6) The use of seclusion and restraint where written justification is inadequate or non-existent and where less intrusive methods were not considered.

(7) Failure of the hospital administration to monitor the unwarranted use of seclusion and restraint.

(8) Failure of staff to note clients' response to activity services.

(9) Failure to monitor and evaluate the quality and appropriateness of activity services.

(10) Failure to provide adequate education services.

(11) Violation of life safety standards. 699 F.Supp. at 1197. Other conditions in Broughton noted by a team of federal officials, while this suit was pending, dealt with deficiencies with respect to minimum standards for Medicaid intermediate care of mentally retarded patients:

(1) "[I]nconsistent supervision in the delivery of individualized plans of care for residents, specifically as to areas of health, hygiene, grooming and toilet training."

(2) No evidence that the mental retardation professional "had assured that all recommendations were carried out."

(3) Deficits in staff training concerning developmental needs and other issues.

(4) Only custodial care in the living units.

(5) Lack of privacy at shower time.

(6) Lack of systematic training for residents to develop eating skills.

(7) Failure to document drug reviews in the clients' record or make the reviews available to professional staff.

(8) On ten of ten records reviewed, no evidence that the physical therapist had conducted an initial screening.

(9) That recreation equipment was not visible and in enough quantity to carry out the stated objectives of the activities program.

699 F.Supp. at 1198.

## II

■ The Secretary argues that the court improperly found that the class members had a right to treatment in the least restrictive environment. He is concerned that the court improperly requires community placement for class members.

The court did not apply a least restrictive analysis. Rather, the court identified the class members' right to *minimally adequate* habilitation in a setting *minimally adequate* to reduce self-abuse and aggression. 699 F.Supp. 1205–06. The court ordered habilitation in "a training setting which approximates the more normal environment against which their increasing independence will be measured," "the development of individual plans for moving class members to more normal settings," and "the provision of alternative habilitation settings where professional recommenda-

tions can be carried out." 699 F.Supp. at 1204.

The court's order follows *Youngberg's* teaching that the "minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints." 457 U.S. at 322, 102 S.Ct. at 2461. We do not interpret the court's order to require community placement of all class members. The court has set up a process in which the needs of each class member will be evaluated by professionals on a case-by-case basis. The court can do no more than to articulate general standards to guide these evaluations. The professional evaluators may or may not find that the minimally adequate setting for habilitation for an individual class member is placement in the community. Such a finding would be consistent with dictum in *Parham v. J.R.*, 442 U.S. 584, 607, 99 S.Ct. 2493, 2506, 61 L.Ed.2d 101 (1979), which recognized the necessity of a continuing need to review commitment to a mental institution. *Parham* dealt with the commitment of children, but there appears to be no reason why its principles should not be applied to persons whose incompetency results from mental retardation instead of age. *See Clark v. Cohen*, 794 F.2d 79, 86 (3d Cir.1986); *Thomas II*, 781 F.2d at 374–76.

### III

■ The Secretary also contends that the court defined the class too broadly to include mentally retarded adults who were released from psychiatric hospitals after the date of class certification, March 22, 1984. The Secretary takes the position that persons who are no longer in state custody have no substantive due process rights to minimally adequate treatment and thus should not be included in the order. The Secretary principally relies on *Youngberg, Thomas II,* and *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), for the proposition that the state has no duty to provide services to persons not under state control.

We held in *Thomas II* that a mentally retarded patient retained his constitutional rights under *Youngberg* after transfer from a state psychiatric hospital to an inappropriate detoxification center. We reasoned that his status as a legally incompetent adult who is a ward of a state-appointed guardian had not changed and he had no choice about his living arrangements. 781 F.2d at 374. Here, too, the order provides a remedy for retarded patients who were in a public psychiatric institution after March 22, 1984, but subsequently released from state control.

■ *DeShaney*, 109 S.Ct. 998, does not support the proposition that persons who were in state custody at the time of class certification and later released have no right to a remedy. There, the Supreme Court held that the due process clause does not require the state to protect a child who is not in state custody from harm caused by his father. The Court specifically distinguished *Youngberg* by pointing out that the state does have a duty to provide services when it restrains a person's liberty through institutionalization. *See* 109 S.Ct. at 1005–06. Here all members of the class were institutionalized patients on the date of certification. The evidence discloses that in some instances treatment recommended by professionals, which would have satisfied the constitutional requirements explained in *Youngberg*, was either not implemented or implemented improperly resulting in harm to the patients. In other instances the treatment *Youngberg* contemplated was not even recommended. The district court sought to remedy the harm suffered by class members whether they remained in the institution or had been discharged. The object of the court's order is twofold: to ameliorate the lingering effects, if any, of improper treatment; and to remedy inappropriate community placements, if any, such as those described in *Thomas II*, 781 F.2d at 372–73, that were not anticipated by professionals in the institutions. We believe that the state's duty to render the kind of treatment prescribed by

*Youngberg* is not discharged by simply releasing a class member from the institution where he or she had been hospitalized. Otherwise the state could unilaterally avoid the obligations imposed by *Youngberg* and *Thomas II* and defeat the claims of class members by terminating their institutional care while the case was pending. There is no evidence that state officials have acted with this improper motive, but surely the class members who were discharged after the class was certified are entitled to the consideration due those class members who remain in the institutions.

Furthermore, we note that the district court's definition of the class is only a practical starting point for identifying the persons needing help. If the class members have not been injured by constitutionally inadequate treatment in the past or are currently receiving minimally adequate treatment in appropriate placements, their present situation need not be disturbed. A special master will be available to hear disputes and make recommendations about the present condition of class members who have been discharged. The district court retains jurisdiction to modify its order.

## IV

■ The Secretary argues that remedial treatment awarded to persons no longer in state custody is compensation for a past violation of law and thus falls into the category of retroactive relief forbidden by the Eleventh Amendment.

The district court's decree does not run afoul of the Eleventh Amendment. The court did not award monetary damages to any class member in contravention of the principles explained in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The court did not order injunctive relief simply to compensate for past violations of a patient's constitutional rights. Thus, if a patient had been previously subjected to unconstitutional conditions but presently was not affected by past unconstitutional practices, the Secretary was not required to provide remedial treatment.

The court's decree provides only prospective relief to class members who were in a hospital on the date the class was certified or who subsequently were admitted to a hospital. The decree addresses the present needs of the patients. Class members discharged from the hospitals while this action was pending are entitled, under the decree, to the constitutional protection delineated in *Youngberg* in accordance with the standards adopted by the Supreme Court. *See* 457 U.S. at 314–25, 102 S.Ct. at 2457–63. If the present conditions under which class members live do not meet constitutional requirements as explained in *Youngberg*, or if a patient is presently suffering from unconstitutional conditions imposed while in the hospital, the decree provides appropriate prospective relief. The decree fully comports with the remedy approved in *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), and *Clark v. Cohen*, 794 F.2d 79 (3d Cir. 1986).

## V

■ The Secretary argues that the appointment of a special master was an abuse of discretion. In his view, the district court erred by failing to specify the exceptional circumstances warranting a master. He contends that no exceptional circumstances are present.

Rule 53(b) of the Federal Rules of Civil Procedure states in pertinent part: "A reference to a master shall be the exception and not the rule.... [I]n actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it."

The court explicitly found that exceptional circumstances existed to warrant its appointment of a master. 699 F.Supp. at 1205. Although the court did not specify these circumstances, the exceptional circumstances are clear from the findings of fact and conclusions of law. The class is large, and each class member requires individualized consideration. The general responsibilities of the master are to hear and report on disputes about inclusion in the

class and the adequacy of treatment to those in the class. 699 F.Supp. at 1207. The district court retains jurisdiction to modify the order as necessary. Other courts have appointed special masters in institutional reform cases such as this involving a large class of plaintiffs. *See, e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1159–63 (5th Cir.1982), *amended in part on another issue on rehearing,* 688 F.2d 266 (5th Cir.1982); *Gary W. v. Louisiana,* 601 F.2d 240, 245 (5th Cir.1979).

The facts of *La Buy v. Howes Leather Co.,* 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), cited by the Secretary as support for the proposition that the district court abused its discretion in appointing a master, are quite different. There, the district court referred antitrust cases to a master before liability was determined because the cases were complex and would take too much time to try. 352 U.S. at 252–54, 77 S.Ct. at 311–12. The Supreme Court stated that the reference to a master "amounted to little less than an abdication of the judicial function depriving the parties of a trial before the court on the basic issues involved in the litigation." 352 U.S. at 256, 77 S.Ct. at 313. In contrast, the parties here have had a trial and a decision on the merits by the district court. We hold that the appointment of a special master for the remedial stage of this case was justified by exceptional circumstances for implementation of the court's decree.

## VI

The Secretary's final argument is that the findings of facts adopted by the district court are clearly erroneous. He claims that numerous findings of fact have no basis in the record. He contends that the fact finding process was flawed because the court did not defer to professional judgment as required by *Youngberg,* 457 U.S. at 307, 102 S.Ct. at 2452. He argues that the court ignored substantial evidence rebutting the testimony of the class members' witnesses.

Initially, we reject the Secretary's suggestion that we apply a heightened standard of review because the district court adopted the class members' proposed findings of facts and conclusions of law. The court described the process it followed in reviewing the proposed findings as follows:

> In this case the court did not simply adopt plaintiffs' proposed findings verbatim. After trial, both sides submitted proposed findings of fact and conclusions of law. After reviewing the proposals and the entire record, the court tentatively concluded that plaintiffs should prevail and adopted plaintiffs' proposal as the first draft of an opinion. The court then spent many hours checking and editing plaintiffs' proposal to insure that the final draft of the opinion was faithful to the evidence as a whole.

App. 267. An argument similar to the Secretary's complaint was rejected by the Supreme Court in *Anderson v. Bessemer City,* 470 U.S. 564, 571–73, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985).

We find that the record supports the district court's findings. Further, the court properly followed the standards of *Youngberg* in making its factual findings. Finally, we reject the Secretary's argument that the court ignored rebuttal evidence. The court listened to testimony and reviewed extensive documentary evidence and deposition testimony. It is the role of the district court, not this court, to weigh the evidence and judge the credibility of the witnesses. *See* Fed.R.Civ.Pro. 52(a); *Anderson,* 470 U.S. at 573–76, 105 S.Ct. at 1511–13.

## VII

In conclusion, we note that to be effective, the injunction must be implemented in a practical way by both parties in the remedial phase of the lawsuit. At oral argument, counsel for the parties indicated that before proceedings were stayed pending appeal they had constructive meetings about implementing the order. We encourage the parties to continue this progress toward resolving the details of the remedial phase in a manner that will be practical, efficient, and compassionate, having due regard for the authority of the Secretary to

care for patients in accordance with accepted professional standards and the right of the patients to the protection that the Constitution affords them.