**THOMAS S., by his guardian ad litem, Joyce M. BROOKS, Jeanette H., Todd C., Phillip B. and Margaret R., by her guardian ad litem, Cornelius Manly, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**David T. FLAHERTY,[1] Secretary, North Carolina Department of Human Resources, and Allen Childress, in his official capacity as guardian for plaintiff Thomas S., Defendants.**

No. C-C-82-418-M.

United States District Court, W.D. North Carolina, Charlotte Division.

Nov. 21, 1988.

---

**1.** David T. Flaherty succeeded Phillip J. Kirk as Secretary, North Carolina Department of Human Resources, on April 8, 1987, and is, therefore, being substituted as a party defendant pursuant to Fed.R.Civ.P. 25(d)(1).

Edward G. Connette, Gillespie, Lesesne & Connette, Charlotte, N.C., Roger Manus and Deborah Greenblatt, Carolina Legal Assistance, Raleigh, N.C., for plaintiffs.

Wilson Hayman and Doris J. Holton, Asst. Attys. Gen., North Carolina Dept. of Justice, Raleigh, N.C., for defendant Secretary of Human Resources.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

McMILLAN, District Judge.

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | HISTORY OF PROCEEDINGS | 1181 |
| II. | FINDINGS OF FACT | 1183 |
|  | A. Plaintiff–Intervenors | 1183 |
|  | 1. Jeanette H. | 1183 |
|  | 2. Todd C. | 1184 |
|  | 3. Phillip B. | 1184 |
|  | 4. Margaret R. | 1184 |
|  | B. Plaintiff Class | 1184 |
|  | 1. Description of the Class and General Findings | 1184 |
|  | 2. Aggression, Self–Abuse and Other Physical Injury | 1186 |
|  | 3. Drugs | 1186 |
|  | i. Adverse Effects | 1187 |
|  | ii. Standards for Avoiding, Minimizing and Treating Adverse Effects | 1187 |
|  | iii. Behavior Control | 1188 |
|  | iv. Chemical Restraint | 1188 |
|  | v. Excessive Dosages | 1188 |
|  | vi. Polypharmacy | 1188 |
|  | 4. Seclusion and Mechanical Restraint | 1188 |
|  | 5. Unnecessary Confinement | 1190 |
|  | i. Locked Wards | 1190 |
|  | ii. Institutional Confinement | 1190 |
|  | 6. Association/Access to Community | 1192 |
|  | 7. Habilitation | 1192 |
|  | i. Individual Evaluations and Treatment | 1192 |
|  | ii. Trained Staff | 1192 |
|  | iii. Inhumane Living Conditions | 1193 |
|  | iv. Abnormal Environment | 1193 |

|  |  |  | Page |
|---|---|---|---|
|  | v. | Unavailable Services | 1193 |
|  | vi. | Behavior Problems | 1194 |
|  | vii. | Deterioration and Loss of Self–Care Skills | 1194 |
|  | 8. | Lack of Adequate Community Services | 1195 |
|  | 9. | Professional Judgment | 1196 |
|  | 10. | Certification—Accreditation | 1197 |
| III. | CONCLUSIONS OF LAW |  | 1199 |
|  | A. | Substantive Due Process Rights Under Youngberg v. Romeo | 1199 |
|  |  | 1. Safety | 1200 |
|  |  | 2. Freedom from Undue Bodily Restraint | 1200 |
|  |  | 3. Minimally Adequate Habilitation | 1200 |
|  | B. | State Created Liberty Interest Related to Purpose of Confinement | 1202 |
|  | C. | State–Created Liberty Interests Based on State Regulations | 1202 |
|  | D. | Freedom of Association | 1203 |
| IV. | RELIEF |  | 1204 |

## I. HISTORY OF PROCEEDINGS

Paul Caldwell, next friend of plaintiff Thomas S., filed this suit on July 7, 1982, seeking declaratory and injunctive relief under federal and state law. Also on July 7, 1982, Mr. Caldwell was appointed guardian *ad litem* for Thomas S. On July 10, 1984, Joyce M. Brooks was substituted as guardian *ad litem* for Thomas S.

Thomas S., a nineteen-year-old Gaston County resident when this action was filed, had been diagnosed as suffering from, *inter alia,* schizophrenia and borderline mental retardation, and was incapable of either living independently or managing his own affairs. Given up for adoption at birth, Thomas spent his first eighteen years in approximately forty different foster homes and institutions while in the custody of the Gaston County Department of Social Services ("DSS"). DSS shuffled Thomas through so many placements during his youth because there were no appropriate community-based treatment facilities available in Gaston County during this period.

Soon after Thomas' eighteenth birthday, DSS succeeded in having Thomas declared legally incompetent. In February, 1982, defendant Allen Childress, regional adult mental health specialist with the North Carolina Department of Human Resources, was appointed Thomas' guardian. Because Childress considered Thomas' then-current placement, a rest home for the elderly, inappropriate, Childress caused Thomas to be admitted to the "R" (mental retardation) unit at Broughton Hospital on March 15, 1982.

Four months after Thomas was institutionalized at Broughton, his next friend brought this suit against Sarah Morrow, then Secretary of the North Carolina Department of Human Resources ("Secretary"); Allen Childress, in his official capacity as Thomas' guardian ("guardian"); and the directors of two local agencies, DSS and the Gaston–Lincoln area mental health program. The Gaston County Commissioners later were joined as additional defendants.

The complaint alleged that the defendants had denied Thomas substantive due process accorded by the Fourteenth Amendment. It protested the defendants' failure to provide minimally adequate treatment, alleging that Thomas' hospitalization imposed a degree of restraint on his liberty inconsistent with professional judgment regarding his treatment. The complaint charged that the defendants had deprived Thomas of liberty interests created by state law, a procedural due process claim under the Fourteenth Amendment. The complaint also asserted various pendent state law claims. Thomas requested an injunction ordering the defendants to place him in an appropriate group home and to provide other treatment recommended by professionals who had examined and worked with him.

On May 26, 1983, the court entered a consent judgment permitting the two local agency defendants to contract with an independent nonprofit organization for foster

care and treatment from the date of Thomas' discharge from Broughton until March 1, 1984. Because of the consent order, the court deferred all parties' motions for summary judgment and declared the case inactive until February 1, 1984.

On March 22, 1984, four individuals, Jeanette H., Todd C., Phillip B. and Margaret R., moved to intervene as plaintiffs. The court appointed Cornelius Manly as guardian *ad litem* for Ms. R. on May 4, 1984. Also on March 22, 1984, these individuals joined Thomas S. in a motion to certify a statewide class of similarly situated individuals pursuant to Fed.R.Civ.P. 23. The class is defined as:

> adults who are mentally retarded or who have been treated as mentally retarded and who are or will be inappropriately kept in public psychiatric institutions in North Carolina in conditions violative of their constitutional rights.

After reactivating the case, the court found that Thomas had been shifted to at least three additional placements since the consent judgment was filed. On August 15, 1984, the court heard arguments on all pending motions. The court ruled on the cross motions for summary judgment on September 18, 1984. *Thomas S. v. Morrow*, 601 F.Supp. 1055 (W.D.N.C.1984). All pendent state law claims against state officials were dismissed, in accordance with *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The claims against the local officials also were dismissed without prejudice. Relying on *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed. 2d 28 (1982), the court granted summary judgment against the Secretary and the guardian on Thomas' substantive due process claim without reaching the procedural due process claim.

On December 7, 1984, the court entered a judgment requiring the Secretary and the guardian to develop a treatment plan and appoint a case manager for Thomas. The judgment directed them to furnish Thomas the treatment recommended by qualified professionals who had evaluated his needs. In accordance with the recommendations, the order specified that Thomas should be placed in a "stable suitable supervised community residential placement such as: (1) a non-institutionalized specialized adult foster care situation ... or (2) a group home with adults of average intelligence." Adhering to the recommendations, the court also directed that Thomas should be provided non-residential services such as mental health counseling, adult basic education and vocational training, and "opportunities for community interaction." The Secretary and the guardian appealed.

Also on December 7, 1984, the court permitted the intervention of the four additional plaintiffs and certified the class pursuant to Fed.R.Civ.P. 23(b)(2), to be represented by Thomas S. and the intervenors. However, the court stayed further litigation on behalf of the intervening plaintiffs and class members pending the outcome of the appeals.

The court's judgment was unanimously affirmed with one technical modification by the Fourth Circuit Court of Appeals. *Thomas S. v. Morrow*, 781 F.2d 367 (4th Cir.1986). Thereafter, the Secretary's petition for rehearing and rehearing en banc were denied. Separate petitions for writs of *certiorari* by the Secretary and the guardian were similarly denied by the Supreme Court. 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986), 479 U.S. 869, 107 S.Ct. 235, 93 L.Ed.2d 161 (1986).

Once the judgment in favor of Thomas S. was affirmed on appeal, the court vacated the stay, allowing litigation on behalf of the intervenors and the class to proceed. On May 28, 1986, Phillip J. Kirk, then Secretary of the Department of Human Resources, was substituted as a party defendant. On July 30, 1986, the court heard plaintiffs' motion for partial summary judgment on behalf of the class. On August 19, 1986, the court denied this motion without prejudice and ordered an evidentiary hearing.

The case was heard on March 5 and 6, 1987. Counsel for the Secretary requested and was granted leave to offer additional evidence. On May 5, 1987, the court heard additional evidence.

Plaintiffs claim that the confinement conditions imposed on class members in the state's psychiatric hospitals violate their constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment. The Division of Mental Health, Mental Retardation and Substance Abuse Services ("MH/MR/SAS") operates within the Department of Human Resources. The state is divided into four regions, each of which serves the population in a designated area. Each region has a psychiatric hospital (Broughton Hospital in the Western region, John Umstead Hospital in the North Central region, Dorothea Dix Hospital in the South Central region and Cherry Hospital in the Eastern region), and a mental retardation center. The plaintiffs' claims do not involve the state's mental retardation centers. The plaintiffs seek declaratory and prospective injunctive relief against the Secretary in the form of constitutionally required treatment that is consistent with the recommendations of qualified treating professionals.

In deciding this case, the court has carefully considered all of the evidence bearing on each issue, and notes that there have been conflicts in the testimony concerning: what constitutes minimally adequate habilitation; what factors compromise class members' safety; when drugs or mechanical restraints are being used excessively and numerous other professional matters. The court made decisions involving credibility and weight to resolve these conflicts. In assessing credibility, the court took into account the demeanor of the witnesses, any interest or bias, and the knowledge, education and training of the witnesses in the field of mental retardation. In addition to credibility decisions, the court relied heavily on the reports and recommendations of the Secretary's professionals to define "accepted professional judgment, practice and standards" for application to the facts of this case. *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. The court did not attempt to determine which of several professionally acceptable choices should have been made. Instead, in reviewing the voluminous evidence to determine if the Secretary is providing minimally adequate training, the court deferred to the reasonable judgments of qualified professionals.

## II. FINDINGS OF FACT

### A. Plaintiff–Intervenors

#### 1. *Jeanette H.*

Intervenor Jeanette H. was admitted to Dorothea Dix Hospital in Raleigh in 1981. She was originally diagnosed as suffering from chronic undifferentiated schizophrenia, but this diagnosis was later dropped. She is diagnosed as mildly mentally retarded. Early in her admission, it was recognized by the state's treating professionals that she needed a supervised living situation in the community. Pl.Ex. 31 at 2. Nonetheless, she was kept at Dix and continuously medicated. She had behavior problems that did not improve with the medication. While at Dix, she suffered a severe case of lithium toxicity. Since becoming an intervenor in this case, she was enrolled in a sheltered workshop, her medication was reduced, and in January of 1987 she was discharged from Dix to a family care home in the community. Pl.Ex. 31.

#### 2. *Todd C.*

Todd C. is a resident of Dix Hospital. He was diagnosed as having an intellectual function on the borderline between average intelligence and mild mental retardation. He was also diagnosed as suffering from an atypical psychosis by history, histrionic personality disorder, seizure disorder, and hydrocephaly. He lives on a "management stepdown" ward which houses mentally ill patients at a maintenance stage of treatment. When Mr. C. was admitted to Dix in 1981, the state's professionals noted that "a psychiatric admission ward is not adequate treatment for this patient." Over the next five years, less restrictive, community-based placements were repeatedly recommended for Mr. C. by the Secretary's professionals. Despite these recommendations, Mr. C. remains at Dix Hospital. He has frequently been secluded and mechanically restrained. Pl.Ex. 30.

### 3. *Phillip B.*

Phillip B. was admitted to Dix Hospital in March of 1983. He has been diagnosed as functioning intellectually in the moderate to severe mental retardation range. He has not been diagnosed as suffering from any mental illness. He was hospitalized at Dix after "a few violent outbursts" at a group home. His treatment professionals recommended community placement, but he had to wait for several months at Dix during which time his behavior regressed. Pl.Ex. 32 at 4. At his commitment hearing in January of 1984, the attorney representing Mr. B. admitted to the court that he would be kept at Dix even if he did not meet commitment criteria. Pl.Ex. 27 at 4. After Mr. B. was permitted to intervene in this case, he was discharged from Dix Hospital. He is now living successfully in the community. Pl.Ex. 32.

### 4. *Margaret R.*

Margaret R. was first admitted to Broughton Hospital in 1973. She has been diagnosed as suffering from organic brain syndrome and an organic personality disorder. She appears to function in the range of mild mental retardation. After intervening in this case, Ms. R. was placed in a rest home for the aged. The rest home where Ms. R. was placed is the same one used for Thomas S. and found by this court to be inconsistent with the professional judgment of those who examined and treated Thomas S. 601 F.Supp. at 1058–59. This home does not offer necessary services for mentally retarded people. This placement was the Secretary's attempt to implement the long-standing recommendation of the state's treating professionals that Ms. R. be placed in a less restrictive, community-based residence (such as a group home for the mentally retarded). After the rest home refused to continue to care for Ms. R., she was returned to Broughton Hospital. Ms. R. has no diagnosis of mental illness, yet she continues to live on a general psychiatric ward. Ms. R. appeared and testified in the evidentiary hearing in this case. She expressed her desire to live in the community, but there is no appropriate program for her. Tr. 232, 505, 527.

## B. Plaintiff Class

### 1. *Description of the Class and General Findings*

There are approximately four hundred mentally retarded class members in the state's four psychiatric hospitals. The estimated number of class members has ranged from 393 to 470. Approximately half or more of those persons have no diagnosis of mental illness. Pl.Ex. 42 at 8. For example, on February 27, 1986, forty-seven percent of the class members confined at the state psychiatric hospitals had a diagnosis of mental retardation only. Pl.Ex. 10.

Mental retardation involves difficulty and slowness in learning and delayed development of intellectual functioning. *Youngberg*, 457 U.S. at 309 n. 1, 102 S.Ct. at 2454 n. 1; Glenn Dep. at 22–23. Mental illness, on the other hand, involves a disturbance of emotions or thinking, from whatever cause, which interferes with a person's ability to handle life situations. Glenn Dep. at 23; Tr. 23. The psychiatric facilities use a medical model which starts with the concept that a person has a sickness and that sickness is treated. The mental retardation/developmental disability model provides an opportunity for development. It provides training and education called "habilitation." Tr. 556–57; Pl.Ex. 46 at 3. Habilitation is defined as follows:

> "The process by which the staff of an agency assists an individual to acquire and maintain those life skills that enable the individual to cope more effectively with the demands of his or her own person and environmental and social functioning. Habilitation includes, but is not limited to, programs of formal structured education and treatment."

*Association For Retarded Citizens of North Dakota v. Olson*, 561 F.Supp. 473, 488 n. 20 (D.N.D.1982) (quoting Accredition Council for Services for Mentally Retarded and Other Developmentally Disabled Persons, "Standards for Services for Developmentally Disabled Persons" (1981 edition)).

Of approximately 470 adults with mental retardation in the hospitals, 404 were iden-

tified as being confined in general psychiatric wards of the hospitals. Pl.Ex. 3 at 1–2. Only one of the hospitals (Broughton) has a unit designated for mentally retarded people and that unit houses some but not all of the class members at Broughton. There is a professional consensus that mentally retarded people who are continuously exposed to mentally ill patients begin to "model" the dysfunctional behaviors of the mentally ill patients with whom they are confined. Pl.Ex. 43 at 45–54; Pl.Ex. 46 at 15; Glenn Dep. at 32–33. There is also professional consensus that developmental, behavior-based treatment called "habilitation" is the appropriate milieu for people with mental retardation.

More than half of the class members have been identified as being "voluntarily" committed to the psychiatric institutions pursuant to N.C.Gen.Stat. § 122C–211 (1986). Most of these class members have no guardian and have signed themselves into the institution. Pl.Ex. 19. A number of the "voluntarily" institutionalized plaintiffs who do not have guardians are severely mentally retarded and lack the capacity to understand the legal step they have taken. Pl.Ex. 18 at 2.

Many of the class members who were originally identified by the Secretary on discovery as having a diagnosis of mental retardation were later reclassified by the Secretary as having a behavior disorder. A behavior disorder is a problem some mentally retarded people have in conducting themselves, which is characterized by self-injury, aggressiveness, or rage reactions. It is not considered a mental illness. Tr. 23, 204. It is considered a "grab-bag" term which is sometimes used to label clients who are a management problem. Tr. 415.

There are striking similarities between the conditions which led to the relief granted original plaintiff Thomas S. and the conditions in which the intervenors and plaintiff class members are forced to live. For example, at Broughton Hospital alone there are at least thirty-five class members for whom group home or family care placement in the community has been recommended by the Secretary's treating professionals. Despite these recommendations, many of these plaintiffs remain confined in state psychiatric hospitals. The record is replete with other examples of placement and treatment recommendations being ignored or their implementation being unjustifiably delayed. Numerous other constitutional violations have been established, including the following, which are discussed in detail below:

(a) Many of the plaintiffs have no diagnosis of mental illness, yet they are placed in facilities for the mentally ill.

(b) Some of the plaintiffs have been inappropriately placed in rest homes for the elderly.

(c) Many of the plaintiffs have behavioral problems which make them difficult patients to treat. This difficulty is frequently used by the state to justify inappropriate placements.

(d) Many of the plaintiffs have been recommended for appropriate placement and treatment in less restrictive residential settings, including group homes or specialized foster care. These recommendations, made by state employees (including doctors, social workers, psychologists, and occupational therapists) were often incorporated in treatment plans. The placement recommendations and the treatment plans are frequently ignored, and the plaintiffs remain confined year after year in state psychiatric institutions.

(e) At times the people responsible for consenting to or approving commitment of a class member to a state psychiatric hospital do so because there is literally no other place for the class member to go.

(f) For many of the plaintiffs, there are no established alternatives to placement in a state psychiatric hospital. The state has chosen not to make appropriate alternatives available. For other plaintiffs, established alternatives (such as state facilities designed to treat mental retardation) are unavailable.

(g) Many of the plaintiffs are wards of the state. Further, the state has control

over the liberty and care of each class member while he or she is committed to a state psychiatric institution. Some class members have been kept in a state psychiatric hospital long after the original commitment order required their release.

### 2. *Aggression, Self–Abuse and Other Physical Injury*

Class members have been physically injured as a result of the conditions at the four state psychiatric institutions. Approximately fifteen percent of the institutionalized class members engage in self-injurious behavior. Pl.Ex. 13 at 2. Other class members engage in assaultive behavior. Pl.Ex. 10. When appropriate services are offered, self-injurious and aggressive behaviors are significantly reduced or totally extinguished. Tr. 49–50.

Aggression or assaultive behavior in mentally retarded people can be caused by crowding, noise levels, frustration, or lack of appropriate training. The state's mental retardation deputy explained, for example, that if a mentally retarded person is told to "make your bed" and that person does not know how to make the bed and does not know how to tell the person giving the command, "I don't know how to do that," he or she can get very frustrated and may attack the person who gave the command. Mentally retarded people are often excluded from the opportunity to learn because of assaultive behavior of this type that results from their frustration. Pl.Ex. 44 at 8–9, 15.

"Habilitation" is a term used to refer to the process of helping a person with mental retardation acquire needed skills. The principal focus of habilitation is on learning and training, because mental retardation is a learning disability and a training impairment, rather than an illness. *Youngberg,* 457 U.S. at 309 n. 1, 102 S.Ct. at 2454 n. 1; Pl.Ex. 46 at 3; Pl.Ex. 44 at 12.

The Secretary offers few, if any, habilitation or behavior programs for mentally retarded adults confined in the state psychiatric hospitals. When behavioral modification treatment is offered, the evidence suggests that the treatment is not adequately individualized, monitored, or re-evaluated to comport with minimal professional standards for treatment of mentally retarded persons.

Due to inadequate behavioral programming, class members are sometimes injured at their own hands. Pl.Ex. 42 at 4. For example, Guy W., class member at Broughton Hospital, has been institutionalized since 1936 when he was sixteen years old. He began to self-induce vomiting in 1979. His treatment plan shows that his primary habilitation need in order to be discharged from the institution is to improve his behavior. Yet, no training has been provided to help him learn to stop this behavior.

Danny W. is a member of the class. He is blind, mentally retarded, and confined to a ward at Broughton Hospital. He engages in self-abusive behavior. He bites his hand, and he has begun to eat feces. He sits in a wheelchair on a very handicapped ward with very little to do. He has not been given any sort of habilitation. Tr. 52.

A behavior plan was proposed for intervenor Todd C. to stop him from self-abusive behavior, but it was not used for several years. The Secretary made no attempt to justify this failure to follow the professional recommendation.

On some wards, there are not enough staff members to assure safety of the residents. Glenn Dep. at 35–36, 63; Pl.Ex. 41 at 16.

Some class members have been injured by the lack of adaptive equipment or the improper use thereof. Glenn Dep. at 106–08; P.Ex. 41 at 4. Mary W. has been severely injured. Pl.Ex. 42 at 10; Tr. 39–50, 93.

### 3. *Drugs*

Class members have been seriously endangered and injured by the inappropriate use of antipsychotic drugs. This group of drugs belongs to a class of psychotropic medications used to treat certain psychiatric disorders. The terms "antipsychotic," "neuroleptic," and "psychotropic" have

been used interchangeably throughout the evidence, but have different meanings. Antipsychotic drugs are drugs used to treat psychotic disorders where people are not in touch with reality. Tr. 148. Antipsychotic drugs include Thorazine, Mellaril, Haldol, Loxitane, Prolixin, and a number of others. Tr. 298. They are not useful in treating or relieving the effects of mental retardation. Pl.Ex. 50.

Of class members institutionalized at three of the four state psychiatric hospitals, seventy-three percent were being given antipsychotic drugs, yet forty-three percent of that group has no diagnosis of mental illness. Tr. 230.

i. Adverse Effects.

Antipsychotic drugs are dangerous and can cause a number of severe adverse effects, including tardive dyskinesia, an irreversible neurological disease where a person has involuntary movements of the face, arms and legs. Tr. 149–50, 376. Tardive dyskinesia occurs in people without regard to their mental condition, Tr. 370, and about thirty percent of people who receive prolonged antipsychotic drugs develop tardive dyskinesia. Tr. 208.

Professional standards and the Secretary's policies require periodic monitoring of drug adverse effects. Pl.Ex. 52 at 28; Def.Ex. 8; Tr. 339–40. This has not been done for most class members. Pl.Ex. 42 at 2, # 5; Pl.Ex. 42 at 4, # 1(b); Tr. 225, 342–43. The evidence shows that the Secretary's agents' use of antipsychotic drugs on the class members in their custody has resulted in tardive dyskinesia for a number of class members. Pl.Ex. 42 at 2, ## 3–4; Pl.Ex. 42 at 4, # 2; Pl.Ex. 22 at 2; Tr. 330, 338.

Plaintiffs' pharmocological expert, Dr. Henry Crabbe, personally examined thirty-three class members who were being given antipsychotic drugs at three of the state psychiatric institutions. Based on the brief personal examination alone, Dr. Crabbe observed that of those examined at Cherry Hospital, eighty-eight percent manifested symptoms of adverse effects; forty percent showed such symptoms at Broughton

Hospital; and thirty-three percent showed such symptoms at Dix Hospital. Tr. 151, 223–24.

ii. Standards for Avoiding, Minimizing and Treating Adverse Effects.

Because of these serious adverse effects from antipsychotic drugs, minimal professional standards as well as the Secretary's written policies require that patients, their families, and/or their legal guardians be informed about the risks, side effects and benefits of psychotropic medications. Pl.Ex. 52 at 28; Tr. 339–40; Def.Ex. 56.

The Secretary introduced a number of policies from the Standards of Clinical Practice Manual and the Nursing Policy Manual at Dorothea Dix Hospital and some policies that apply statewide. The standards on medical education provide that patients or their legal guardians shall be informed about the risks, side effects and benefits of specific medications including psychotropics, and that evidence of this instruction as well as the patient's response to it be documented in the patient's medical record.

The Secretary and his agents have failed to follow these policies for many class members. None of the records of class members presented to the court reflect that these policies were ever applied to them. Pl.Exs. 30, 31, 32, 42; Def.Exs. 14, 15, 36. Class member Thelma B., who is *severely* retarded, is purported to have signed an "X" to "informed" consent for medication. Pl.Ex. 42 at 4, ## 11–12; Pl.Ex. 39. Professional standards also require a periodic review of the antipsychotic drug prescriptions to see if they are needed. Pl.Ex. 52 at 5; Tr. 339–40; Pl.Ex. 43 at 16. Yet this has not been done for some class members. Pl.Ex. 43 at 31.

Medical standards require continuing efforts to reduce the amount of neuroleptic drugs a person receives. Tr. 337; Pl.Ex. 52 at 5; Tr. 339–40. This was not done for a number of class members. Pl.Ex. 41 at 16; Tr. 175–76, 337–38.

In a study based on the medical records of thirty-nine patients (out of a population

of 675) at Dix Hospital, it was determined that in twenty-one percent of the cases, medication was not reduced even where tardive dyskinesia was diagnosed. Tr. 378. This violates state and national standards. Pl.Ex. 52 at 28.

Medical record keeping is substandard and dangerously inadequate. Tr. 172, 225, 334–35.

### iii. Behavior Control.

One of the ways the Secretary has most endangered plaintiffs is by the long-term use of antipsychotic drugs for the purported purpose of controlling behavior disorders. Evidence was introduced that the American Psychiatric Association published a Tardive Dyskinesia Task Force Report in 1979 finding that the efficacy and safety of the long-term or "maintenance" use of antipsychotic drugs for mentally retarded people with behavior disorders had not been adequately demonstrated. Pl.Ex. 50. Medical standards proscribe the long-term (or "maintenance") administration of antipsychotic drugs to mentally retarded people with no mental illness, even if they have a behavior problem. Pl.Ex. 42 at 1–2, ## 1–2; Pl.Ex. 42 at 5, # 3; Tr. 151, 169–71, 339–40; Pl.Ex. 52 at 28.

Even on a short-term basis, it is not acceptable to rely on drugs to the exclusion of other methods to treat people with behavior problems. Yet the Secretary has used drugs in this way on many class members. Glenn Dep. at 38–39, 46, 49, 62; Pl.Ex. 41, at 9, 16, 17; Tr. 50–51, 152, 164–66, 174, 417; Pl.Ex. 43 at 18.

For example, Mary W. has been on anti-*psychotic* drugs even though in 1953 she was not psychotic but, rather, "a mentally *deficient* person for whom the hospital has nothing to offer." The drugs are purportedly used for her behavior problem. This has continued since the 1950's without any documented behavior training, even though her condition worsened and the records show that medication was not effective. Pl.Ex. 42 at 4, # 1; Tr. 50–51.

Other class members have also been sedated by the long-term use of antipsychotic drugs in lieu of behavioral program and without any regard to the safety or usefulness of the drugs for the class members. Pl.Ex. 42 at 5, ## 3–4.

### iv. Chemical Restraint.

"PRN" medications are medications given pursuant to a physician's standing order which allows lower level hospital staff to use their own discretion to decide when to administer a drug. When it involves antipsychotic and related medications, it is a form of chemical restraint. In long-term residential units, its use can result in overmedication in lieu of alternative behavior programming. Twenty-four percent of class members at Broughton Hospital were subjected to chemical restraint during a recent one-month period; at Dix Hospital, the figure was sixty-one percent; at Cherry Hospital, the figure was seventy percent. Tr. 173–175. Many states have rules for facilities for the mentally retarded which prohibit this practice of giving antipsychotic drugs "PRN." Tr. 174.

Data on the frequency of use of "PRN Med Restraint" during one month show that, at least in some cases, there is no correlation between the use of such restraints and incidents of aggression toward self and others. One class member received "PRN meds" twenty-three times in a month, with only four reported incidents of "aggression." Another class member was given "PRN meds" twenty-one times, but only three incidents of aggression were reported. Pl.Ex. 10 at 25–28. The court does not find that the use of chemical restraint in emergency situations is a substantial departure from professional judgment. However, these illustrations tend to show that when chemical restraints are authorized "PRN," they are overused and represent a substantial departure from the professional judgment of a qualified treating professional.

### v. Excessive Dosages.

The Secretary administers excessive dosages of drugs to class members. Pl.Ex. 43 at 31. This unnecessarily subjects them to risks of overmedication. There is a professional consensus that the usual mainte-

nance or long-term dose for antipsychotic medication translates into the equivalent of 200–300 milligrams of Thorazine. Most of the institutionalized class members are on a long-term regimen of antipsychotic drugs. The average Thorazine equivalent dosage among the state hospitals varies markedly but is always far above the professionally accepted usual maintenance dose. Among the class members sampled, the average daily Thorazine equivalent was 592 milligrams at Dix Hospital, 746 milligrams at Broughton Hospital, and 1,114 milligrams at Cherry Hospital. Where doses are higher, there is a higher likelihood of adverse effects.

The Secretary made no effort to explain these variations or excessive dosages. Tr. 179–82. The standard used at Cherry Hospital for the daily dosage range of antipsychotic drugs is so broad that it is acceptable under that standard for a large dose to be forty times greater than a low dose, and the decision is a pure judgment call by the doctor. Tr. 551; Def.Ex. 45 at 4. There are instances where class members are given dosages which exceed even the institution's own guidelines, with no justification given. To exceed established drug dosage maximum limits without showing a justification is a substantial departure from professional standards. Tr. 176–77.

The Secretary administered the psychotropic drug Lithium to named intervening plaintiff Jeanette H. so that the level of Lithium in her blood reached 6.58—an alarming level. Plaintiff's psychopharmocological expert had never seen a patient have a blood Lithium level of more than 3.9 and still live. Tr. 166–68. In fact, Jeanette H. went into a coma and was transferred to the critical care unit for Lithium toxicity. During the time she was being given Lithium, the Secretary was also giving her Thorazine. Pl.Ex. 31 at 3, 9–13.

vi. the Polypharmacy.

The Secretary admits that some types of polypharmacy, such as administering more than one antipsychotic drug to a person at one time, are not generally accepted medical practice. Tr. 423. Nevertheless, this is done to some class members. Intervenor Jeanette H. was kept on a number of antipsychotic drugs together including Thorazine and Prolixin. Tr. 398. Class member Freddie S. continued to receive three different psychotropic medications, despite the fact that his assessment shows he benefits little from the medication. Pl.Ex. 38. No explanation was offered by the Secretary for these departures from professional standards.

The manner in which the Secretary has administered antipsychotic drugs to class members, in violation of the standards discussed above, is a substantial departure from the exercise of professional judgment. Tr. 182.

4. *Seclusion and Mechanical Restraint*

Mechanical restraint is the practice of tying or strapping someone to a bed or a chair. Seclusion is the practice of confining a patient alone in a bare room. Glenn Dep. at 38; Def.Ex. 11.

It is a substantial departure from professional standards to rely routinely on seclusion and restraint rather than systematic behavior techniques such as social reinforcement to control aggressive behavior. Seclusion and restraint should only be used as a last resort. Glenn Dep. at 38; Pl.Ex. 42 at 6–7; Pl.Ex. 43 at 44; Pl.Ex. 45 at 24–26.

In the state psychiatric institutions, however, seclusion and restraint are used often on plaintiffs. About seventeen percent of the class members were secluded or restrained during a reported one-month period, including eleven plaintiffs who were restrained fifty-three times even though they had no documented evidence of aggression towards themselves or others. Pl.Ex. 10; Pl.Ex. 42 at 5; Tr. 53. Class members are more likely to be subject to mechanical restraint in defendant's psychiatric institutions than when they are elsewhere. Pl.Ex. 44 at 6. Some class members have been mechanically restrained when they were noisy or annoying to other patients.

For example, class member Magdeline S. has been secluded and restrained for holler-

ing and she has sometimes not been released when she quieted down. Pl.Ex. 42 at 5–6, # 4. The Secretary repeatedly restrained class member Geraldine G. of Broughton Hospital for being noisy and annoying other patients. Tr. 63. Class member Mary W. at Broughton Hospital engaged in self-injurious behavior in the form of hitting herself in the head. She has been in soft body restraints or a geriatric chair (a type of restraint) for almost all of the time since the late 1940's. The restraint started out at nine hours a day most days (in the mid to late 1940's), then increased to nineteen hours, then to twenty-four hours a day. For decades and continuing to the present, she has been restrained for all of her waking hours. The records do not reveal that behavior training was ever considered or tried to help her stop trying to hit herself. In 1975 a doctor recommended fitting her with boxing gloves so she would not injure herself with her hands. However, gloves were never even tried because she had no money in her account. Pl.Ex. 33. The use of restraint on Mary W. in this manner is a substantial departure from professional judgment which the Secretary has not attempted to explain. Pl.Ex. 42 at 6, # 5; Tr. 39, 42, 47, 48, 50, 51.

Formerly a member of the *Willie M* class, class member Fred S. is now twenty-one years old and is in Dix Hospital. Since there is no adequate behavioral training to stop his assaultive behavior, the staff continues to seclude and mechanically restrain him when he acts aggressively. He was secluded and restrained almost sixty percent of the days he has been at Dix. The average time in seclusion on those days has been 2.9 hours. For almost all of the time he was secluded, he was restrained (usually four-point restraint—spread-eagled). During one two-week period, Fred S. was secluded for eleven of fourteen days with an average seclusion period for each of 6.4 hours. The Secretary has failed to explain this excessive use of seclusion and mechanical restraint and has failed to provide class members with adequate training to overcome the behavior problems that trigger it. See Section II.B.7, *infra.*

## 5. *Unnecessary Confinement*

Many of the plaintiffs have been unnecessarily confined in locked wards of psychiatric hospitals for lengthy periods of time, despite a professional consensus that they need not be locked up in that way even if they have some mental illness or behavior problems and notwithstanding the recommendations of individual treatment professionals that they be placed in less restrictive environments in the community. Pl.Ex. 44 at 2–3; Pl.Ex. 43 at 2, 24–25, 36; Pl.Ex. 46 at 29.

### i. Locked Wards.

In the four state psychiatric hospitals where mentally retarded persons are housed, almost all of the wards are locked, at least for part of the day, and movement within the wards is contained by staff. Pl.Ex. 41 at 4; Tr. 26, 107. Many class members on locked wards could live in a more open setting if such were available. Glenn Dep. at 32, 110–11.

### ii. Institutional Confinement.

The evidence established that psychiatric stabilization normally takes approximately twenty-one days and that behavior stabilization normally takes thirty to one hundred and twenty days. Pl.Ex. 45 at 21; Pl.Ex. 6. Class members, however, stay an average of ten years in the state psychiatric institutions. Pl.Ex. 42 at 7, # 1(b); Tr. 70. At Cherry Hospital, the average class member has been confined for twenty-five years. Tr. 70; Pl.Ex. 14. At Dix Hospital, almost half of the class members have been confined for over fifteen years. Pl.Ex. 42 at 7, # 2. No attempt was made by the Secretary to justify such lengthy hospitalizations or to explain regional differences. The Secretary's agents admit that many class members have been hospitalized much longer than is appropriate for them and that many others should not be there at all. Pl.Ex. 46 at 29. Like the original named plaintiff, Thomas S., many mentally retarded persons who are now at the state psychiatric institutions do not need to be institutionalized even if they also have mental

illness or behavior disorder. Pl.Ex. 44 at 2–3; Def.Ex. 16 at 92; Glenn Dep. at 128–29.

The North Carolina Mental Health, Mental Retardation, and Substance Abuse Act of 1985 authorizes involuntary commitment of persons who are mentally ill and dangerous to themselves or others, or who are mentally retarded and have a behavior disorder and are dangerous to themselves or others. N.C.Gen.Stat. § 122C–261 (1986). However, the Secretary has involuntarily confined persons who do not in fact meet this standard. Tr. 239, 255.

As in the case of Thomas S. himself, such institutional confinement results from an absence of appropriate alternatives and is not based on professional judgment. Tr. 115–17; Pl.Ex. 44 at 4.

There are 238 class members incarcerated in the psychiatric institutions on what is termed a "voluntary" status, but the facts indicate that their confinement is not truly voluntary. Some have been "volunteered" into the institution by a guardian, just as was Thomas S., including some who have no mental illness. Tr. 256. Others do not have a guardian, but have signed themselves into the institution. Many of these have mental retardation to such a degree that they cannot exercise informed consent to make such an important legal decision. Pl.Ex. 42 at 8, ## 7–11; Tr. 25, Pl.Ex. 39. They have purportedly signed themselves in even though they did not know what they were signing. Tr. 241; Pl.Ex. 39.

Some class members are involuntarily committed following a court hearing because they have no place else to go. Class members' appointed counsel have stipulated that their clients meet the commitment standard even when they do not, because the attorney knows that a discharge from the hospital would result in the person being dumped into the streets with no place to go. Tr. 251–52. Judges have committed class members while acknowledging that the decision is made for humanitarian reasons even though the legal standard has not been met. That is what happened in the case of class member Phillip B. *Id.;* Pl.Ex. 27.

In a few cases, again because there was no place else to go, class members have been held at the hospital, in some cases for years, following a court decision that they be discharged. Pl.Ex. 42 at 7–8, ## 4–6.

Class member Jacob B. has been kept at Cherry Hospital since 1960, even though the Secretary's professionals think that he should have been released into the community many years ago and probably should never have been in the institution in the first place. Pl.Ex. 43 at 21.

When intervenor Jeanette H. entered Dorothea Dix Hospital in 1981, it was recognized by her treating professionals that she needed a supervised living situation in the community. Such a setting was not available. In June of 1983, Jeanette's treatment team continued to recommend placement in a group home with a sheltered workshop program for Jeanette. Jeanette's treatment plan of December 20, 1983, recognized that she "possesses all the necessary skills for semi-independent living outside the institution." Jeanette continued to be confined in the institution for three more years, despite this recommendation by her treating professional. Pl.Ex. 31 at 2, 6–7.

At Broughton Hospital, there are at least eleven class members on Ward 36, twelve on Ward 37, five on Ward 10, and seven on Ward 11 for whom group home or family care placement in the community has been recommended but not implemented. Pl.Ex. 21.

With regard to named plaintiff Todd C., it was recommended by mental retardation professionals that community residential facilities that are less restrictive than Dorothea Dix Hospital, and which offer vocational opportunities and appropriate structure including behavior management, strategies, and instructional strategies be tried. Pl.Ex. 29 at 2. Again in January of 1986, Todd C.'s treating physician recommended that he be placed in a less restrictive setting within twelve months. He was finally placed in a community based residential program on December 4, 1987, almost two years later.

### 6. Association/Access to Community

Thirty-three percent of institutionalized class members have little or no social interaction. Pl.Ex. 42 at 7, # la.

Many are desperate for the attention and affection which they are not getting in the institution. Tr. 89.

According to the Secretary's expert Smull, mentally retarded persons have a higher sense of self-worth and self-esteem when they feel that they are part of the community. A person's self-esteem is essential for habilitation. Adequate involvement in community activities for mentally retarded persons consists of being as involved as that individual is capable of being at the time. Pl.Ex. 45 at 11–12, 17.

Most class members in the state psychiatric institutions have inadequate access to community activities. Pl.Ex. 41 at 17–18; Pl.Ex. 45 at 33. The court's findings concerning unnecessary confinement are also relevant to the issue of access to the community.

Class members are forced to associate almost exclusively with other institutionalized mentally disabled people along with staff members on revolving shifts. Pl.Ex. 41 at 17–18. In many cases, this forced association is unnecessary and does not reflect the exercise of professional judgment; instead, it is a function of the location, design, and size of the facilities. *Id.* State psychiatric institutions are like ghettos for persons with mental handicaps. The lack of access to the outside world gives the feeling of being in prison. Pl.Ex. 46 at 16.

Class member Calvin A. at John Umstead Hospital likes to run away, go uptown to a restaurant and get himself a sandwich and a cup of coffee. His treatment plan was designed to discourage and prevent this access to socializing in the community. Def.Ex. 16 at 177.

### 7. Habilitation

For class members, "minimally adequate training" within the meaning of *Youngberg* requires the Secretary to offer reasonable habilitation services. 457 U.S. at 317, 102 S.Ct. at 2458. The Secretary's experts concur with those of plaintiffs that minimum professional standards require *developmentally* oriented "habilitation" for persons with mental retardation. Pl.Ex. 44 at 12, 22; Pl.Ex. 41 at 19; Tr. 31, 145; Glenn Dep. at 27.

"Habilitation" is the process of helping a person with mental retardation to acquire needed self-care skills. The term refers specifically to the needs of mentally retarded individuals. Tr. 30, 89–90, 294–95; *Youngberg,* 457 U.S. at 309 n. 1, 102 S.Ct. at 2454 n. 1. Developmental habilitation leads persons through stages of human development to increase their capacity for living more independently. Glenn Dep. at 26. All class members, including those who also have mental illness, are entitled to developmental habilitation. Pl.Ex. 41 at 4–5, 18.

#### i. Individual Evaluations and Treatment.

The first condition of providing appropriate habilitation is a good interdisciplinary evaluation. The Secretary's professionals and plaintiffs' experts agree that adequate assessment of the individual needs of each class member is an essential prerequisite. Pl.Ex. 15; Glenn Dep. at 20, 54–55, 64; Tr. 34, 146, 325; Pl.Ex. 43 at 33–34; Pl.Ex. 44 at 11.

For the great majority of class members, however, there is no interdisciplinary assessment, and those that do occur are inadequate. Pl.Ex. 45 at 38; Glenn Dep. at 37, 46, 49, 53–55, 60; Pl.Ex. 41 at 5, 13, 16. The Secretary has failed to treat each class member as an individual with unique needs. Instead, class members are placed in existing programs that are the same for everyone, regardless of need. This is a substantial departure from minimally acceptable professional standards for treatment of mentally retarded persons. Pl.Ex. 15; Tr. 32, 145, 325; Glenn Dep. at 14, 20, 32, 65; Pl.Ex. 41 at 4, 13, 16–17.

#### ii. Trained Staff.

Properly trained staff are also a prerequisite to providing developmental habilita-

tion. Tr. 38; Pl.Ex. 44 at 16–17; Pl.Ex. 27; Pl.Ex. 45 at 38–39. In the state psychiatric hospitals, trained staff are not available for class members, particularly on general psychiatric units, where the vast majority of class members reside. Glenn Dep. at 35–36; Pl.Ex. 45 at 38–39; Tr. 38.

One reason for the Secretary's failure to provide properly trained staff is the *medical rather than developmental orientation of the state mental hospitals.* Glenn Dep. at 26–27; Pl.Ex. 41 at 11. In the words of the assistant clinical director at Cherry Hospital, "[w]e are not in the business of treating with the adult developmental model." Tr. 556.

Since mental retardation is not a medical problem, medical training by itself does not qualify a person to work as a mental retardation professional. Tr. 138, 407–08. Many of the staff in state psychiatric hospitals who are deciding the fate of class members are not trained to be mental retardation professionals. Pl.Ex. 45 at 38–39.

### iii. Inhumane Living Conditions.

Humane living conditions are a prerequisite for habilitation. Pl.Ex. 41 at 4. Many class members are subjected to inhumane living conditions in state psychiatric institutions, including: overcrowding; total lack of personal space and privacy; inadequate furnishings and clothing; aesthetically barren physical surroundings; and endless days of boredom without variation. Pl.Ex. 43 at 4, 35; Pl.Ex. 41 at 4, 14–16; Pl.Ex. 45 at 33; Tr. 25–27. Keeping mentally retarded people in such living conditions represents a substantial departure from minimally acceptable professional standards. Glenn Dep. at 31–32; Pl.Ex. 41 at 4.

### iv. Abnormal Environment.

Professionals unanimously agree that mentally retarded persons need to be treated in as normal a setting as possible. Tr. 66, 145; Pl.Ex. 44 at 22; Pl.Ex. 45 at 34. Access to ordinary activities is essential for learning. Mentally retarded adults learn and grow through observing and participating in the commonplace events of daily life.

Glenn Dep. at 32, 73; Pl.Ex. 41 at 28; Tr. 31–32. Class members are more likely to learn independent living skills in a family-type situation where there is continuous and constant opportunity to practice those skills than in an institution. Tr. 32; Pl.Ex. 43 at 54; Pl.Ex. 44 at 13; Pl.Ex. 45 at 24–26.

The state psychiatric institutions provide very abnormal living environments. Tr. 31; Pl.Ex. 45 at 36. As a result, treatment of class members is seriously compromised. Within the state psychiatric hospitals, there are not enough structured activities to keep class members from developing inappropriate behaviors or losing independent living skills in the abnormal institutional environment. They learn to live in an institution, and their ability to be integrated into the community and adapt to community life deteriorates. Glenn Dep. at 44–46, 132; Tr. 90; Pl.Ex. 43 at 26–27.

Mentally retarded persons learn by observation, but they do not always have the insight to distinguish appropriate from inappropriate behavior. Thus, when class members are confined with mentally ill people, they copy the social behavior of the mentally ill patients. This is called modeling. It further harms the class members and further reduces their chances of living in a normal setting. Glenn Dep. at 32–33; Pl.Ex. 41 at 4; Pl.Ex. 43 at 45–56; Pl.Ex. 46 at 15.

For example, in April, 1986, the attending psychiatrist of named plaintiff Jeanette H. found that Ms. H.'s behavior problems were caused by the fact that she was a retarded person residing within a hospital geared to treat the mentally ill. Pl.Ex. 31 at 31. By January, 1987, this psychiatrist recognized that Jeanette's behavior while residing within the hospital was chaotic, but that when she attended her sheltered workshop assignment in the community, she was "one of the best residents in attendance there." Pl.Ex. 31 at 46.

### v. Unavailable Services.

There is no dispute that class members need developmental training and structured programs. This includes, for example,

training in basic self-care skills, community living skills, speech therapy, and vocational services. Pl.Ex. 43 at 3, 11–13, 20; Pl.Ex. 45 at 15, 32, 34, 39. Because vocational activities are often a key to greater independence and enjoyment of liberty, they are for most class members an essential service to avoid unnecessary restraint. Pl.Ex. 42 at 10, # 6. However, vocational services are not available to most class members. Pl.Ex. 19 at 3. Adequate programs for speech, behavior, and self-care skills also are not available. Pl.Ex. 43 at 18; Glenn Dep. at 43–44, 49, 55, 60; Pl.Ex. 43 at 15.

Class members have little, if any, hope of maintaining or improving their self-care skills because they are not offered treatment designed for the learning disabled. Pl.Ex. 42 at 10, # 6, and at 11, ## 1–3. Class member Jacob B. was at Cherry Hospital for twenty-two years. He never went to school there. He is described as mentally disturbed because he talks to his fingers out of boredom and loneliness. Pl.Ex. 43 at 28. He does very well in structured activity but does not get what he needs, according to Secretary's experts. The Secretary terminated a greenhouse program he was in. Pl.Ex. 43 at 19. Other programs serving class members also have been terminated by the Secretary without regard to the needs of the clients. Pl.Ex. 43 at 2.

#### vi. Behavior Problems.

As was true in the case of Thomas S., many class members have behavioral problems which make them difficult to treat. As was true for Thomas S., however, this difficulty does not excuse the Secretary from providing appropriate placement and services. This court has already stated that "[p]eople with problems are rarely easy to deal with. If plaintiff were 'normal,' then he would not need the treatment the professionals say he needs." *Thomas S.,* 601 F.Supp. at 1058.

The Secretary's professionals admit that if a class member has a behavior problem, a specific plan should be developed and implemented to reduce the inappropriate behavior by teaching him or her appropriate social behaviors. Pl.Ex. 44 at 12; Pl.Ex. 45 at 24–26; Tr. 417. For the vast majority of class members, this has not been done. Pl.Ex. 42 at 11, # 5; Glenn Dep. at 22, 24–25, 31; Pl.Ex. 41 at 13–15, 17, 18a; Pl.Ex. 43 at 15; Pl.Ex. 46 at 15; Tr. 496; Pl.Ex. 42 at 6–7. Intervenor Jeanette H. responded well to a token economy program in 1984, but it was discontinued for reasons unrelated to her needs. Pl.Ex. 31 at 28.

Intervenor Todd C.'s examining physician found that his adaptive level of functioning was "under this patient's potential *due to lack of resources* to control behavioral disorder. A structured environment and residential active treatment in a M.R. [mental retardation] program should improve his level of functioning and production." Pl.Ex. 30 at 2. This was not provided until very recently.

#### vii. Deterioration and Loss of Self–Care Skills.

People with mental retardation have a problem maintaining the skills that they have. There is a significant risk that unless attention is paid to class members' developmental and habilitation needs, their skills will atrophy and they will regress. Pl.Ex. 44 at 18–19. Some class members have suffered a significant deterioration in the self-care skills they possessed when they were first admitted to the state's care. Some class members have been denied appropriate habilitation for so long that the Secretary has labeled them institutionalized and given up hope for them. Pl.Ex. 6 at 4. Magdeline S. has been at Dix Hospital since 1930 when she was eleven years old. The Secretary admits that she is so "institutionalized" and "regressed" that community placement is considered by staff to be unrealistic in the absence of an appropriate mental retardation facility. Pl.Ex. 34; Pl.Ex. 42 at 9, ## 4(d)(1) and (2). Class member William D. was admitted to Broughton Hospital in 1958. He was able to speak and make statements to the hospital interviewer when he was admitted. By 1985, however, Mr. D. had regressed to the

point that he was considered to be nonverbal, and efforts to find a community placement for him were terminated. Pl.Ex. 37.

Another class member, Mary W., cannot feed herself at all. However, the records clearly show that in 1946 she only needed to be spoonfed "at times." Because of her self-abusive behavior, she was tied down for extensive periods of time. Tr. 48. Her legs have therefore atrophied so that she can no longer walk. She contracted tuberculosis in 1969 while in the hospital. She is now virtually mute, uttering two to four stereotyped, "parrot-like" words or phrases over and over.

The Secretary's failure to provide adequate evaluations, staff, humane and normal living conditions, and developmental and behavior programming is a record of failure to exercise professional judgment, making it clear that the state has not provided the professionals with minimally adequate resources for habilitation for plaintiffs.

8. *Lack of Adequate Community Services*

The system administered by the Secretary is plagued by a severe lack of community resources for plaintiffs. This drought of community services results in the unnecessary confinement of class members in highly restrictive settings for lack of another place to go, just as it did for Thomas S. Pl.Ex. 44 at 4, 30; Pl.Ex. 46 at 9–10; Tr. 123. This is true even when legal criteria for hospital admission are not met. Pl.Ex. 27; Tr. 128–29. It also frustrates the exercise of professional judgment by mental health and mental retardation professionals who become discouraged by the futility, year after year, of recommending services that do not exist. Tr. 115–17; Pl.Ex. 42 at 9–10, # 3; Pl.Ex. 46 at 9–10.

Minimum standards require that plans be in place for moving class members to increasingly normal settings. Pl.Ex. 41 at 5; Pl.Ex. 15. For many class members, this planning has not been accomplished. Glenn Dep. at 42, 56, 63–64; Pl.Ex. 9; Pl.Ex. 41 at 6, 7, 8, 16. Dix Hospital has a recently adopted policy to discharge patients who are admitted for mental retardation with behavior disorder to the community or to O'Berry Mental Retardation Center within ninety days if at all possible. Tr. 364. However, the policy is not implemented because community programs are limited and O'Berry Center is full. Tr. 411–12. In Mecklenburg County, hundreds of people are waiting to get into group homes. In Madison County, there are no group homes. Pl.Ex. 46 at 12.

Placement of mentally retarded adults in rest homes does not meet minimally acceptable professional standards, according to mental retardation professions within the state and without. Pl.Ex. 46 at 12–13; Tr. 124–25. Yet many institutionalized class members, including Margaret R., have previously been placed in rest homes. A task force report of the Secretary noted in 1982:

> As it is now, many severely and profoundly mentally retarded clients are medicated—some heavily—and put in rest homes because they are not admittable to mental retardation care services, but the rest home may be a less appropriate place for them in terms of their needs.

Pl.Ex. 6 at 5.

The historic reliance on rest home placement with little or no follow-up perpetuates the "revolving door" readmissions of mentally retarded people to the state psychiatric institutions. Pl.Ex. 41 at 18.

Plaintiff Jeanette H. was admitted to Dix in 1978 for behavior problems related to the fact that she could not live at home and the lack of adequate community placements. She had been put in several inappropriate rest homes which offered no developmental or behavioral programming at all and where she exhibited aggressive behavior which caused her to be expelled. She was kept at Dix and continuously given medication that did not improve her behavior, but was not afforded adequate developmental or behavioral programming. She became pregnant while in the hospital. Her psychiatrist noted in 1980 that he saw no need for her to be on antipsychotic drugs but commented that, "[s]he will probably remain in the hospital indefinitely

since she has outbursts [of aggressive behavior] every several months ... and also because of her reputation amongst *rest homes* where she has been tried in the past...." Def.Ex. 14 at 21–23 (emphasis added). No options such as adult foster care placement (like that ordered for Thomas S.) or structured group homes were available to be considered for Jeanette.

The Secretary has demonstrated that mentally retarded people with severe behavior disorders, including individuals with mental illness, can receive appropriate treatment in a group home setting. However, the program was discontinued for reasons unrelated to the needs of class members. Pl.Ex. 44 at 22–24.

One reason there are not enough community-based services is funding. In the past, the Division allocated money for group homes, but there has not been an expansion in state-funded group homes in years. Pl.Ex. 47 at 4–6. The professionals are ready to provide adequate services for class members, but funds are not available. Pl.Ex. 46 at 29.

The Secretary's policies and practices regarding allocation of resources to serve the needs of class members are based on political exigencies rather than on the best interests of the individual class members, or even on cost effectiveness. Pl.Ex. 46 at 10.

### 9. *Professional Judgment*

The lack of minimally adequate programs inside the psychiatric institutions and the lack of community-based services throughout the state system run by the Secretary have prevented the exercise of professional judgment by the Secretary. This has been demonstrated throughout the records of individual class members.

There is a tendency among human service professionals in the state psychiatric institutions to conform their recommendations for treatment or habilitation of class members to the constraints imposed by the state's inadequate service delivery system, rather than to exercise true professional judgment. Tr. 114–15, 127. After recommendations are made that can not be acted on, professionals stop making the recommendations. In many of the instances where an institution clinical record contains a statement to the effect that community placement is not appropriate for a particular client, the writer of the record is likely referring to the limited nature of existing community resources rather than other types of community resources that should be developed in order to allow for the exercise of true professional judgment. Tr. 115–16.

At least one professional was threatened that his career would be jeopardized because of his unwillingness to modify his professional judgment to conform with what was available in the Secretary's institutions. He was also given false information about the time of a court hearing when he attempted to insist upon a course that was dictated in his professional opinion by the needs of the individual, but unavailable in the Secretary's system. Tr. 117, 127.

Some of the Secretary's agents who testified as psychiatric experts made statements in response to questioning by their lawyer that they personally exercised professional judgment or that they believed professional judgment was generally exercised on behalf of class members at the psychiatric hospitals. Tr. 387, 395, 404, 406, 541, 557. They are not mental retardation professionals. Tr. 407–08, 556. These general statements conflict with statements in the records and charts of class members in which recommendations for community placement, short-term hospital stays, structured community programs, behavior plans and numerous other specific treatments were not carried out. *See, e.g.,* Pl.Ex. 30; Pl.Ex. 31; Pl.Ex. 33. These general statements also conflict with the testimony of plaintiffs' experts and statements produced in internal memoranda and task force reports of defendants in which class members are identified as needing services or community placements that are not available. Pl.Ex. 6; Pl.Ex. 11; Pl.Ex. 12. The Secretary's agent, Dr. Jerry Norton, gave testimony concerning intervenor Margaret R. that conflicts with the substance of a written statement signed by him in March of 1984, just prior to Ms. R.'s

asking the court for leave to intervene. Pl.Ex. 26. Dr. Norton testified that he had changed his mind. Tr. 523–24. These conflicts are resolved by the court on the basis of credibility in favor of the opinions of plaintiffs' experts and in favor of the contemporaneous treatment recommendations and observations made by the treating professionals in the plaintiffs' charts. Likewise, such conflicts are resolved in favor of the studies and internal memoranda produced through discovery of the Secretary's agents who are working toward solution of a known problem.

### 10. Certification—Accreditation

The conditions and services at the state psychiatric institutions are substantially below minimally accepted professional standards; they include major violations of very basic human treatment standards. Pl.Ex. 41 at 4.

Adhering to standards for mental retardation services is particularly important if the mentally retarded person also has mental illness or a behavior disorder, because the mental illness or behavior disorder cannot be treated in the absence of a developmental program. Glenn Dep. at 67. Mental illness alone almost never makes developmental programming impossible. Glenn Dep. at 93; Pl.Ex. 44 at 17.

The Secretary produced documentation that the four state psychiatric hospitals are licensed and accredited by the Joint Committee on Accreditation of Hospitals ("JCAH"). This is a private agency made up of the American Medical Association, American Hospital Association, and other health care groups. Tr. 530–31. Accreditation by JCAH does not suffice to indicate that professional judgment is being exercised with regard to mental retardation services. Glenn Dep. at 134–36. Even the Secretary's expert on accreditation agrees with this. Tr. 567. The JCAH standards include some criteria which reflect upon the minimal adequacy of services for mentally retarded people. In some of these areas, the one JCAH survey report in the record shows serious deficiencies which support the conclusions of plaintiffs' experts. During the most recent JCAH survey at Broughton Hospital, in May, 1986, surveyors found:

(1) Minimal participation of patients and their guardians in treatment planning.

(2) Insufficient professional and support staff to supervise and implement the treatment plan or provide adult educational services.

(3) Inadequate or non-existent emotional, behavioral, activities, legal and vocational assessments.

(4) Inadequate treatment plans and inadequate documentation of their implementation.

(5) Use of special treatment procedures that are not justified in light of the harm they are known to cause.

(6) The use of seclusion and restraint where written justification is inadequate or non-existent and where less intrusive methods were not considered.

(7) Failure of the hospital administration to monitor the unwarranted use of seclusion and restraint.

(8) Failure of staff to note clients' response to activity services.

(9) Failure to monitor and evaluate the quality and appropriateness of activity services.

(10) Failure to provide adequate education services.

(11) Violation of life safety standards. Pl.Ex. 54.

Certification by the Health Care Financing Administration ("HCFA") that a facility is eligible for reimbursement under the Medicare and Medicaid programs does not indicate that professional judgment is being exercised with regard to mental retardation services. Like the JCAH standards, the HCFA standards include some criteria which are necessary, but not sufficient, for evaluating the minimal adequacy of services for mentally retarded people. In some of these areas of overlap, the HCFA survey reports in the record show serious deficiencies which support the conclusions of plaintiffs' experts. During a December, 1986, HCFA survey of Broughton Hospital, surveyors found:

(1) Treatment planning is inadequate;

(2) Goals for the client in the treatment plan are not individualized and are geared more to the needs of the staff;

(3) Treatment procedures are too vaguely stated;

(4) It is often not clear which staff member is responsible for particular aspects of treatment;

(5) Frequently, the only treatment ordered was medication and observation;

(6) Where other treatment was ordered, it was frequently not relevant to the identified needs of the patient and frequently there was no documentation that treatment had been followed up;

(7) In many cases, there were no progress notes to indicate how the patient was responding to the prescribed treatment;

(8) There was inadequate social work for aftercare planning; and

(9) There were too few psychiatrists. Pl.Ex. 56.

In fact, HCFA found that Broughton did not meet the HCFA condition of participation. Pl.Ex. 56. As a result, Broughton Hospital faced losing five to six million dollars per year in federal reimbursements. Tr. 572. Following negotiations between HCFA and state officials and the writing by state officials of a plan for improving Broughton's operations, HCFA reversed its decision despite its findings of deficiencies. Tr. 572–73.

The Medicaid standards for intermediate care facilities for mental retardation ("ICF–MR") are accepted by mental retardation professionals as minimally adequate. Glenn Dep. at 73–75. Of all of the residential units at the four state psychiatric hospitals housing class members, only the Broughton Hospital's R Unit, serving seventy or more class members, has been certified by ICF–MR surveyors. Although the Secretary's only witness to address the issue credited ICF–MR standards as being authoritative, Tr. 484–85, the Secretary offered no evidence to explain why all the other units confining class members did not even attempt to be ICF–MR certified.

ICF–MR certification does not mean that professional judgment is *in fact* being exercised at Unit R. The Secretary himself, through his agents, surveys for compliance. Tr. 481. The Secretary has a vested interest in receiving significant federal reimbursement as a result of finding himself in compliance. Tr. 482, 489; Glenn Dep. at 75–77. On the one occasion when federal officials themselves conducted the survey, Tr. 493, they found numerous significant violations, but certified the R Unit nevertheless when state officials submitted a plan of correction. The federal officials found:

(1) "[I]nconsistent supervision in the delivery of individualized plans of care for residents, specifically as to areas of health, hygiene, grooming and toilet training."

(2) No evidence that the mental retardation professional "had assured that all recommendations were carried out."

(3) Deficits in staff training concerning developmental needs and other issues.

(4) Only custodial care in the living units.

(5) Lack of privacy at shower time.

(6) Lack of systematic training for residents to develop eating skills.

(7) Failure to document drug reviews in the clients' record or make the reviews available to professional staff.

(8) On ten of ten records reviewed, no evidence that the physical therapist had conducted an initial screening.

(9) That recreation equipment was not visible and in enough quantity to carry out the stated objectives of the activities program.

Pl.Ex. 53. These findings, made in 1985, while this suit was pending, supported in part the conclusions reached by plaintiffs' expert Linda Glenn.

The R Unit at Broughton Hospital is the only unit at any of the four state psychiatric institutions designed to house only mentally retarded adults. The evidence shows that it is superior to the general units in a number of respects. However, there is also evidence, in addition to that from the

above-described ICF–MR federal survey, to indicate problems of a constitutional magnitude:

(a) Not all residents of R Unit have received interdisciplinary evaluations. There were no individual programming goals related to the assessed needs of many class members. Glenn Dep. at 50, 118; Pl.Ex. 41 at 6, 16.

(b) There was no way to coordinate activities some residents attend during the day and the activities on the ward where they spend the rest of their time. Glenn Dep. at 118.

(c) The programs to meet the needs of residents were limited. One-third of those whose records were reviewed by plaintiffs' expert Glenn received less than two hours of daily program activity. Pl.Ex. 41 at 6, 16.

(d) In her review, Ms. Glenn found mechanical restraints being used without an accompanying behavior program. Pl.Ex. 41 at 6.

(e) The behavior programs that did exist were not always appropriate. Glenn Dep. at 117.

(f) According to plaintiffs' expert Linda Glenn, the R Unit violates the following very basic human treatment standards: (1) human environment; (2) freedom from undue restrictions; and (3) opportunities to experience ordinary activities. Pl.Ex. 41 at 4; Glenn Dep. at 48–52, 32–33.

(g) The Secretary's expert Dr. Szymanski agreed with Linda Glenn that R Unit appeared too institutional. Pl.Ex. 43 at 4.

(h) Many R Unit residents do not have the chance to visit the outside world regularly and socialize with people of normal intelligence, other than staff. Pl.Ex. 46 at 17–18.

(i) A number of residents on R Unit have been confined there for over ten years. Pl.Ex. 2 at 3–4.

(j) According to state officials, a large number of the residents of R Unit need to live in a regular group home. Pl.Ex. 8 at 2.

## III. CONCLUSIONS OF LAW

### A. Substantive Due Process Rights Under *Youngberg v. Romeo*

█ The legal obligation of the Secretary to provide treatment to class members which embodies the exercise of professional judgment has been established by the court's entry of judgment in favor of the named individual plaintiff, Thomas S. That judgment stands as the law of this case.

In certifying the class pursuant to Fed.R. Civ.P. 23(b)(2), the court stated:

Defendant Morrow [now Flaherty] is responsible for providing treatment for those mentally retarded adults in the state's care. The state system that has been developed for treatment and the alleged deficiencies in the system are applicable to the entire class. Therefore, if the class prevails, final injunctive relief or declaratory relief is appropriate.

Order, December 7, 1984 (Docket #133).

The constitutional foundations for class members' right to treatment, and the applicable case law were articulated at length in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), in this court's order granting summary judgment for Thomas S., *Thomas S. v. Morrow*, 601 F.Supp. 1055 (W.D.N.C.1984), and in the Court of Appeals decision affirming summary judgment. *Thomas S. v. Morrow*, 781 F.2d 367 (4th Cir.1986). The *Thomas S.* decision has already received favorable attention and acceptance from other circuits. *See, e.g., Clark v. Cohen*, 794 F.2d 79 (3rd Cir.), *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986).

█ The constitutional right of class members to treatment comporting with the judgment of qualified professionals is established. Two questions remain to be decided by the court:

1. Have the constitutional rights of class members or the intervenors to receive appropriate treatment been denied by the Secretary?

2. If class members' or intervenors' rights to treatment have been denied, then what relief should the court order?

Plaintiffs claim that the Secretary has violated their substantive due process rights to safety, freedom of bodily movement, and "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg,* 457 U.S. at 319, 102 S.Ct. at 2459.

To decide whether plaintiffs' constitutional rights have been violated, the court must determine whether the Secretary acted reasonably. Assuming that legitimate state interests are implied, the balancing test for determining what is reasonable is whether or not professional judgment has in fact been exercised. The courts must show deference to the judgment exercised by *qualified professionals. Id.* at 322, 102 S.Ct. at 2461.

> The decision [to treat a certain way], if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 323, 102 S.Ct. at 2462.

The qualified professional decision maker is "a person competent, whether by education, training or experience to make the particular decision at issue." *Id.* at 323 n. 30, 102 S.Ct. at 2462 n. 30. Accordingly, this court has ordered that the treatment furnished to the initial named plaintiff, Thomas S., be "based on recommendations formulated by qualified professionals who are familiar with his treatment needs and acting within their respective areas of expertise relevant to the issue being considered." Judgment, December 7, 1984, at 2 (Docket # 135).

The plaintiffs are "entitled to treatment recommended by qualified professionals whose judgment is unsullied by consideration of the fact that the state does not provide appropriate treatment or funding for appropriate treatment." *Thomas S.,* 601 F.Supp. at 1060. Professional judgment probably was not exercised if it was "modified to conform to available treatment rather than appropriate treatment."

*Id. See also Lelsz v. Kavanagh,* 673 F.Supp. 828, 835 (N.D.Tex.1987). With regard to some class members, the Secretary has failed to implement professional recommendations. With regard to other class members, professionals have modified their judgment to conform to *available* treatment rather than *appropriate* treatment (a human reaction). The law of this case also is that the "[l]ack of funding or of established alternatives is not a factor which may be considered in determining the scope" of the constitutional right. *Thomas S.,* 601 F.Supp. at 1059.

We turn now to discuss the implications for the class of the three rights enunciated in *Youngberg.*

1. *Safety.*

■ In the context of this case, the class members' constitutional liberty interest in safety encompasses reasonable protection from aggression by others, protection from self-abuse which can be prevented, and the proper use of basic adaptive equipment and techniques to reduce the risk of physical deterioration among people who cannot walk by themselves. The liberty interest in safety also includes freedom from hazardous drugs which are not shown to be necessary, used in excessive dosages, or used in the absence of appropriate monitoring for adverse effects.

2. *Freedom from Undue Bodily Restraint.*

■ In the context of this case, the class members' constitutional liberty interest in avoiding bodily restraint encompasses freedom from being unnecessarily tied or shackled to a bed or a chair, freedom from solitary confinement except in emergencies, freedom from unnecessary confinement in a locked ward, and not being unnecessarily deported for long periods to psychiatric hospitals which they may not leave to rejoin their home community.

3. *Minimally Adequate Habilitation.*

■ Plaintiffs have the constitutional right to minimally adequate habilitation in a setting designed to reduce self-abuse and

aggression. That means habilitation which will *tend* to render unnecessary the use of chemical restraint, shackles, solitary confinement, locked wards, or prolonged isolation from one's normal community; and conditions of life which are normal enough to promote rather than detract from one's chances of living with fewer restrictions on one's movement.

■ Class members also have a constitutional right to habilitation which is minimally adequate to *maintain* basic self-care skills. In a concurring opinion in *Youngberg*, Justice Blackmun, joined by Justices Brennan and O'Connor, argued that minimally adequate training includes "such training as is reasonably necessary to prevent a person's pre-existing self-care skills from deteriorating...." *Youngberg*, 457 U.S. at 327, 102 S.Ct. at 2464. The court in *ARC of North Dakota v. Olson*, citing Justice Blackmun's concurrence, found a "right to reasonable training which enables the resident to acquire or maintain minimum self-care skills—skills in feeding, bathing, dressing, self-control, and toilet training." 561 F.Supp. 473, 487 (D.N.D. 1982), *aff'd on other grounds*, 713 F.2d 1384 (8th Cir.1983). As the Court explained:

> Given the great difference that *minimum* self-care skills make in the life of most mentally retarded persons, this court regards the acquisition and maintenance of those skills as essential to the exercise of basic liberties. Not only will these skills free residents from the restraint of others who now "help" the residents perform basic functions, these skills will also enable the residents to do a great variety of activities which formerly they could not.

*Id.* See also *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1250 (2d Cir.1984).

■ The intervenors and the class have established by clear and convincing evidence and by a preponderance of the evidence that their constitutional rights under *Youngberg* have been violated by the Secretary. Specifically, the court concludes that:

1. The Secretary has failed to provide reasonably safe conditions of confinement for plaintiffs committed to the state psychiatric hospitals.

2. The plaintiffs have been subjected to unreasonable bodily restraints.

3. The Secretary has failed to provide the plaintiffs with minimally adequate habilitation that is reasonable in light of the circumstances of this case.

4. The Secretary has consistently failed to implement the recommendations of the state's treating professionals.

5. In many instances, the treatment afforded to the plaintiffs was not the result of the exercise of professional judgment.

6. The Secretary's decision to confine mentally retarded persons with no diagnosis of mental illness in state psychiatric hospitals is such a substantial departure from accepted professional judgment, practice and standards as to demonstrate that the decision is not a function of independent professional judgment within the meaning of *Youngberg*.

7. The Secretary's decision to place mentally retarded persons on general psychiatric wards is such a substantial departure from accepted professional judgment, practice and standards as to demonstrate that the decision is not a function of independent professional judgment within the meaning of *Youngberg*.

8. The Secretary's decision to seclude and mechanically restrain the plaintiffs without employing behavioral treatment programs is such a substantial departure from accepted professional judgment, practice, and standards as to demonstrate that the decision is not a function of independent professional judgment within the meaning of *Youngberg*.

9. The Secretary's decision to administer antipsychotic drugs at the levels and under the conditions found to

exist in the state psychiatric hospitals is such a substantial departure from accepted professional judgment, practice and standards as to demonstrate that the decision is not a function of independent professional judgment within the meaning of *Youngberg.*

10. The Secretary's decision to ignore the community placement recommendations of the state's treating professionals is such a substantial departure from accepted professional judgment, practice and standards as to demonstrate that the decision is not a function of independent professional judgment within the meaning of *Youngberg.*

11. The plaintiffs are mechanically and chemically restrained beyond the extent necessary to assure their safety or to provide needed training.

12. The Secretary has failed to provide the training necessary to insure the plaintiffs' safety and to facilitate their ability to function free from bodily restraints.

13. The Secretary has subjected plaintiffs to conditions in which plaintiffs inevitably learn maladaptive behaviors, making it harder for them to adjust to community living and resulting in deprivation of plaintiffs' liberty.

14. If the Secretary provided appropriate habilitation services, the plaintiffs would be subjected to far less bodily restraint. The plaintiffs would then also have substantially decreased likelihood of self-injurious or assaultive behavior.

15. The Secretary may not use the existence of behavior problems as an excuse for failing to provide a plaintiff with minimally adequate habilitation or to follow the recommendations of treating professionals that class members be placed in community-based programs. *Thomas S. v. Morrow,* 601 F.Supp. at 1058.

16. The conditions of confinement imposed on the plaintiffs are more restrictive than is reasonable under the circumstances.

17. Neither JCAH accreditation nor HCFA certification constitutes *prima facie* proof that qualified professional judgment is being exercised for the developmental needs of people with mental retardation. However, if these certifications did constitute such proof, they have been rebutted by overwhelming contrary evidence.

18. The plaintiffs have rebutted the *prima facie* proof of adequate care and treatment which arises from evidence of ICF/MR accreditation of the R Unit at Broughton Hospital.

19. The Secretary has failed to provide minimally adequate training necessary to prevent the class members' pre-existing self-care skills from deteriorating because of their commitment to state psychiatric hospitals.

### B. State Created Liberty Interest Related to Purpose of Confinement

The nature and duration of a person's confinement by the state must bear some reasonable relation to the purpose of the confinement. *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed. 2d 435 (1972). In North Carolina, in addition to the purpose of safety implicit in the involuntary commitment standard, the stated purposes of treatment are individualized treatment to "maximize the development or restoration of a person's capabilities," N.C. Gen.Stat. § 122C–51 (1986), and eliminating, reducing, or preventing the disabling effects of mental retardation and mental illness in the least restrictive appropriate setting. N.C.Gen.Stat. § 122C–2 (1986). Although plaintiffs have been deprived of this state-created liberty interest without due process, the court does not decide the case on this basis.

### C. State–Created Liberty Interests Based on State Regulations

In the case of the individual plaintiff, Thomas S., this court considered plaintiffs'

claim that certain state statutes created protected liberty interests assuring their right to treatment. The court held that it did not need to decide the case based upon these claims since the case could be decided based solely on substantive rights derived from the Fourteenth Amendment. 601 F.Supp. at 1061.

As with the state statutes cited by plaintiffs, regulations promulgated by the Secretary could give plaintiffs additional constitutionally protected rights to treatment. The Secretary's regulations governing class members' treatment in the state psychiatric hospitals provide in part:

Section .01000—Right to Treatment or Habilation

    \*    \*    \*    \*    \*    \*

(b) Each client has the right to receive appropriate treatment or habilitation, and to have an individual written treatment or habilitation plan as specified in G.S. 122–55.5 and 122–55.6. All handicapped clients have a right to habilitation and rehabilitation as specified in G.S. 168–8.

(c) Each client has the right to receive evaluation and treatment or habilitation in the least restrictive environment which includes:

(1) Freedom from unnecessary or excessive medication as specified in 10 NCAC 14F .0600; and

(2) Freedom from physical restraint and isolation that is not absolutely necessary.

Def.Ex. 11.

Although the state-created liberty interests asserted by plaintiffs would be sufficient to support relief, the court need not decide the case on those grounds. Plaintiffs' rights flowing directly from the Fourteenth Amendment are sufficient to support the relief ordered.

### D. Freedom of Association

Plaintiffs also claim that the Secretary has violated their constitutional right to freedom of association. Plaintiffs, like other citizens, have a constitutional right to freedom of association. The Fourteenth Amendment protects from state interference the First Amendment right of citizens to freedom of association. *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed. 2d 231 (1960). Freedom of association is a fundamental right, implicit in the concept of ordered liberty. *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The right includes freedom from state coerced association. "Freedom of association ... plainly presupposes a freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) (citing *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234–35, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261 (1977)). Even an indirect infringement on associational rights is impermissible and subject to the closest scrutiny. *Id.; Healy v. James*, 408 U.S. 169, 183, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972).

The constitutional guarantee not only protects an individual's associations with others for the purpose of advancing shared political and religious beliefs, but encompasses the right simply to meet with others and applies to social and personal associations. *Wilson v. Taylor*, 733 F.2d 1539, 1543 (11th Cir.1984); *Sawyer v. Sandstrom*, 615 F.2d 311, 316 (5th Cir.1980). Every person in a democratic society has the right to select who her/his associates will be in order to express her/his distinct preferences. *Gilmore v. City of Montgomery*, 417 U.S. 556, 575, 94 S.Ct. 2416, 2427, 41 L.Ed.2d 304 (1974). Any state action which directly interferes with this right, or has the effect of chilling the "free play of the spirit," is proscribed by the Constitution. *Shelton*, 364 U.S. at 487, 81 S.Ct. at 251. Moreover, the state cannot compel an individual to choose between exercising his or her First Amendment rights and participating in an otherwise available program. *Thomas v. Review Board*, 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed. 2d 624 (1981).

■ The application of First Amendment principles to persons in institutions has been acknowledged in *Olson*, 561 F.Supp. 473. The *Olson* court explicitly held that the First Amendment guarantees the right to freedom of association for residents who

have mental retardation. *Id.* at 492. Implicit in the right to freedom of association is the requirement that the state provide reasonable opportunities for communication with others, both inside and outside the institutional walls, to all residents who are capable of communicating. *Id.*

▮ Plaintiffs have a constitutional right to associate with non-institutionalized persons and with persons of their choice. Members of the plaintiff class have been unnecessarily congregated and segregated together in large institutions. Consequently, they are foreclosed from choosing their associates and from socializing with non-handicapped or non-institutionalized individuals. They are forced to associate almost exclusively with institutionalized, mentally disabled people and institution staff. In some cases, an acute episode of mental illness may justify a temporary restriction on a person's associational rights. However, in this case the evidence demonstrates that such a justification often does not exist, or that constraint on association persists long after the justification has subsided.

Because of the lack of services in the community, plaintiffs are essentially compelled to choose between the exercise of their First Amendment right to freedom of association and participation in a state program of care and habilitation. This pattern of segregation and congregation prohibits free association and leads to further denial of free association because it is self-perpetuating.

The plaintiffs' right to freedom of association has been violated, as has their right to habilitation necessary to ensure that right. Thus, plaintiffs would be entitled to relief on this ground. However, the court does not decide the case on that ground.

## IV. RELIEF

▮ Based on the foregoing findings of fact and conclusions of law, the plaintiffs are entitled to prospective relief, including orders to insure:

(a) protection from aggression and self-abuse;

(b) safe drug practices;

(c) no unnecessary reliance on shackles, solitary confinement, and other forms of bodily restraint; and

(d) habilitation characterized by:

(1) adequate evaluations;

(2) recognition of the different needs of individuals;

(3) enough adequately trained staff;

(4) humane living conditions;

(5) a training setting which approximates the more normal environment against which their increasing independence will be measured;

(6) the availability of specific developmental services such as special education and vocational training;

(7) appropriate attention, where necessary, to behavioral problems;

(8) the development of individual plans for moving class members to more normal settings; and

(9) the provision of alternative habilitation settings where professional recommendations can be carried out.

The evidence also shows that some class members have suffered injury from unconstitutional conditions of confinement under the Secretary's care and control. Therefore, in addition to the foregoing prospective relief, individual class members have a right to any treatment necessary to remedy any injury that has been caused by their constitutionally inappropriate treatment in the past.

In *Clark v. Cohen,* 794 F.2d 79 (3rd Cir.1986), the court found that a mentally retarded individual who had been wrongfully confined in a state hospital for a number of years without meaningful review of the involuntary commitment was entitled to treatment necessary to remedy the effects of this wrongful confinement. In so holding, the court cited *Thomas S. v. Morrow,* 781 F.2d 367 (4th Cir.1986), with clear approval.

Under *Youngberg,* class members are entitled to minimally adequate treatment consistent with professional judgment to protect their constitutional liberty interests. However, the class members who have been injured as a result of defendant's

failure to provide this minimal level of constitutionally prescribed treatment are entitled to much broader relief if necessary to cure the lingering effects of historic mistreatment. In *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), the Supreme Court held the State of North Carolina responsible for curing the effects of discrimination that continued after desegregation of the state agriculture extension service. Similarly, in *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*), the Court held that prospective remedial relief was clearly appropriate to address the effects of historic discrimination. In that case, the Court upheld remedial reading programs and counseling for black students against Michigan's claims that such relief would be barred by the Eleventh Amendment. The Court relied heavily upon *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). As with other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. The remedy should be designed "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken v. Bradley,* 418 U.S. 717, 746, 94 S.Ct. 3112, 3128, 41 L.Ed.2d 1069 (1974) (*Milliken I*). These cases are instructive because, in this case, the evidence shows that some class members will need special treatment to remedy the harm caused by constitutionally inadequate treatment that they received while hospitalized under the care and control of the Secretary.

Finally, exceptional circumstances exist to warrant the appointment of a special master to hold hearings and make recommendations to the court about: (a) the identity of class members; (b) whether and to what extent each of those individuals' constitutional rights have been violated; and (c) the scope of further appropriate individual relief.

Individual class members, in the proceedings before the special master, are entitled to the benefit of certain presumptions supported by findings about the class general-

ly. *Cf. Teamsters v. United States,* 431 U.S. 324, 358–62 & n. 45, 97 S.Ct. 1843, 1866–68 & n. 45, 52 L.Ed.2d 396 (1977) (success at the initial, "liability" stage of a Title VII class action suit creates a rebuttable presumption in favor of individual relief at the second, "remedial" stage of trial). Therefore, in making future recommendations to the court for individual members of the class, the special master shall operate upon the following rebuttable presumptions:

(a) That the Secretary has violated the rights of individual class members as set out in the foregoing conclusions of law, by providing treatment in the psychiatric hospitals which is a substantial departure from professional judgment as to minimally adequate treatment for mentally retarded persons;

(b) That the individual class members have not received minimally adequate developmental services; and

(c) That except in the Lineberger Building while it was operating as a mental retardation unit, and on the R Unit at Broughton Hospital, no qualified mental retardation professional was exercising judgment on behalf of class members.

An appropriate order will be entered.

### ORDER

This court has entered a memorandum opinion containing detailed findings of fact and conclusions of law. Based upon those findings and conclusions, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. Plaintiff class members have the following constitutional rights in their treatment in the North Carolina psychiatric institutions:

A. Safety, protection from harm, and treatment under safe conditions.

B. Freedom from undue restraint.

C. Minimally adequate habilitation or treatment as described in the conclusions of law:

i. Minimally adequate habilitation designed to reduce self-abuse.

ii. A habilitation setting minimally adequate to reduce the likelihood of aggression or self-abuse.

iii. Habilitation which will tend to render unnecessary the use of chemical restraint, shackles, solitary confinement, locked wards, or prolonged isolation from one's normal community.

iv. Conditions of life which are normal enough to promote rather than detract from one's chances of living with fewer restrictions on one's movement.

v. Minimally adequate habilitation to maintain basic self-care skills.

vi. Habilitation which does not require class members to spend long periods of time in state psychiatric institutions without developmental services.

vii. Habilitation which does not require class members to spend any time in state psychiatric institutions if those class members have no mental illness or behavior disorder.

D. Further, individual class members have a right to any treatment necessary to remedy any injuries caused by their constitutionally inappropriate treatment in the past.

2. The defendant Secretary of the North Carolina Department of Human Resources ("Secretary") and his agents are hereby enjoined from treating class members in a manner that violates the constitutional rights of class members specified above. To assure that class members receive this constitutionally prescribed treatment, the court orders the relief specified below.

3. First, the Secretary shall identify all present class members within 45 days of this order. In making this identification, it shall be presumed that mentally retarded adults (and those who have been treated as retarded) who have been confined in a psychiatric institution at any time since March 22, 1984, have had their constitutional rights violated.

4. Also, within 45 days, the Secretary shall insure that a system is in place for identifying new class members, that is,

adults with mental retardation who enter the psychiatric institution after the date of this order.

5. The individual treatment needs of each class member shall then be independently evaluated to determine whether minimally adequate treatment consistent with constitutional standards is being provided, and to determine whether each class member has been injured as a result of constitutionally inadequate treatment by the Secretary in the past. These evaluations shall be conducted by qualified mental retardation professionals not presently employed by the State of North Carolina, or any local government agency. The parties shall confer and attempt to select these professionals by mutual agreement.

6. If the treatment of any class member does not meet constitutional standards consistent with this order, the Secretary will be required to provide appropriate treatment. Similarly, if any class member has suffered injury as a result of constitutionally inadequate treatment, the Secretary will be required to furnish any treatment necessary to remedy the harm caused by his violation of class members' constitutional rights.

7. Treatment shall be monitored for a sufficient period of time to assure that the Secretary complies in furnishing treatment required under this order. To that end, the Secretary is hereby ordered to submit reports to the court, the master and counsel for plaintiffs detailing his progress in furnishing constitutionally adequate treatment to class members. The first report shall be due 90 days from entry of this order and shall be submitted quarterly thereafter for two years. Thereafter, reports shall be submitted every six months. When the Secretary is able to show the court that all class members are receiving constitutionally required treatment and treatment required for remediation of injuries, and when the Secretary can show the court that further judicial monitoring of this order is not necessary, the court will consider a motion for relief from this order.

8. To assure that the individual class members receive constitutionally required

and remedial treatment, the court will order appointment of a special master. The parties shall confer and attempt to propose by mutual agreement individuals who could be appointed to serve as special master. The court will then conduct a hearing to review nominees, appoint the master and issue a more specific order of reference. The master's responsibilities, consistent with Rule 53 of the Federal Rules of Civil Procedure, and subject to a more specific order of reference to be issued at a later date, shall be:

a. To hear and report on disputes concerning individual mentally retarded adults' inclusion in the class for purposes of relief;

b. To hear and report on disputes concerning the adequacy of treatment being furnished to any class member under the terms of this order; and

c. To monitor and report on the Secretary's overall compliance with the terms of this order. The Secretary shall be liable for paying the salary and expenses of the special master.

9. Periodic evaluations of treatment received by class members shall be conducted by the Secretary at least annually. If there is a change in the needs of class members or other circumstances warranting modification of this order, the parties shall confer and attempt in good faith to propose a modified order consistent with the changed treatment needs or other circumstances. Plaintiffs' attorneys and agents shall be granted ready access to client records and other information concerning treatment needs of class members. In fulfilling their monitoring functions, plaintiffs' counsel shall advise the court as to whether the terms of this order are being carried out and whether the treatment of class members otherwise reflects the exercise of accepted professional judgment.

10. The remedial treatment of class members shall be provided in a manner which promotes their independence, enhances their dignity, and is as consistent as possible with societal norms, in view of class members' special needs.

11. The Secretary shall assure that service providers who shall furnish class members with treatment under this order shall be guided by the decisions and opinions of qualified mental retardation professionals and other qualified professionals involved with their treatment and acting within their respective areas of expertise in making the particular decisions at issue.

12. This order shall be binding upon the Secretary and his successors in office, his agents, and those to whom they have assigned or may assign any duties or responsibilities for the care and treatment of class members.